## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES of AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05-40157-JAR** |
| | ) | |
| **ALBERT LAWRENCE VAUGHAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER

This matter is before the Court on defendant Albert Vaughan's Motion to Suppress

Statement (Doc. 62) and Motion in Limine Regarding Prior Bad Acts (Doc. 44).  A hearing was

held on October 14, 2009, and testimony was presented.  The Court has reviewed the evidence

and the parties' submissions and is prepared to rule.  For the reasons set forth in detail below,

defendant's motion to suppress is denied, as his statements were voluntary.  This does not

necessarily mean that the defendant's statements are admissible, however.  Even though

defendant's statements are party admissions under Fed. R. Evid. 801(d), and thus not hearsay,

they must also meet the requirements of Fed. R. Evid. 403; and they must meet the requirements

of Fed. R. Evid. 404(b) if they reveal or suggest prior criminal conduct, as they do in this case.

In that regard, for the reasons set forth in detail below, the defendant's motion in limine

regarding evidence, including defendant's admissions, of other bank robberies is granted in part

and denied in part. The Court grants the motion and excludes evidence, including defendant's

admissions, of all other bank robberies except for the bank robbery at the Bank of Colorado in

Grand Junction, Colorado on October 2, 2004.  Evidence of that particular bank robbery,

including defendant's statements and admissions concerning his involvement in a bank robbery

in Grand Junction on or about that date, are admissible under Rule 404(b). All other evidence and admissions about other bank robberies will be excluded.

## I.     Background

Defendant's motions require the Court to consider overlapping evidence, the admissibility of which defendant has placed in dispute. In reviewing the background facts underlying these two motions, the Court discusses defendant's statements to Federal Bureau of Investigation Agents ("FBI Agents") generally in Section I.A. and I.B., and the specific bank robberies the government seeks to have admitted in Section I.C.

### A.     Confession

As conveyed in the police report, Albert Lawrence Vaughan was arrested at his residence in North Las Vegas, Nevada on June 29, 2005. He was transported to the Las Vegas Division of the FBI, was given something to drink, and was offered an opportunity to use the restroom.

The agents advised Vaughan that he was charged with a bank robbery in Kingman, Arizona, and there was a possibility he would be charged with bank robberies by different jurisdictions throughout the West, including Arizona, Nevada, Colorado, Wyoming, and Kansas. The agents advised him that it would be in his best interest to wrap all of the bank robberies he had committed into one federal prosecution in Nevada.

The agents produced a form FD 395 Advice of Rights, which they read and asked him to review. Vaughan was asked to sign the form indicating that he understood his rights. He signed the form and told investigators that he would like to speak with them. Vaughan provided the following information[1]:

---

[1] The bank robberies to which defendant confessed are more specifically discussed in Section I.C.

Vaughan robbed his first bank just to see if he could do it, and he continued robbing banks because he enjoyed the rush he got from it. Vaughan stated that he felt the security at banks was poor, and he had discovered ways the banks could improve their security. He previously worked for Hewlett Packard and owned his own computer business, but for the last several years, he was trying to make a living as a professional poker player and pool player. He committed many of the bank robberies when he was low on money. When asked if he had ever pawned items for money, Vaughan said that because he was often low on money, he would have to pawn items to get cash.

Vaughan acknowledged that, in May 2005, he was arrested in Utah. He explained the 9 millimeter handgun and pellet gun found in his vehicle during that arrest were not used during the robberies. He said he did not have a drug problem, but was an occasional user. Vaughan asked if he could work with agents so as not to be charged with the bank robberies, noting that he had previously provided information to arresting officers in Utah regarding his drug supplier in the hope he could work out a reduced sentence.

Several times, Vaughan laughed to himself during the interview and stated that he knew he should not be talking to agents, because they did not have any evidence on him. He stated that he was very careful not to touch any surfaces in the banks he robbed, and he believed he threw away any clothing he wore during the bank robberies after each robbery. When shown photographs of himself robbing multiple banks wearing the same clothing, Vaughan said it appeared on some occasions he may have worn the same clothing multiple times.

Vaughan said that before each robbery he would purchase clothes to wear during the robbery at the nearest Wal-Mart. Agents asked Vaughan whether he took the 9 millimeter

handgun, found in his vehicle after the Utah arrest, with him into any banks. Vaughan denied taking a real gun into any banks, and said he always bought a pellet gun, clothes, and a baseball hat before each robbery, and then threw the items away afterward. Vaughan explained that there was only one robbery where he did not put the gun away right after getting the money because he believed one of the men in the bank was going to "jump him."[2]

The agents would show Vaughan different bank surveillance photographs, and, if Vaughan thought it was him, he would initial the picture. When shown a photograph of a bank robbery he committed, Vaughan could recall the details of the robbery, but when he was not shown a photograph, he was unable to recall the details of the robbery. At one point, agents showed Vaughan a series of photos from a Cheyenne, Wyoming bank robbery, but Vaughan said that he was not sure the photos looked like him. The agents informed him that if he did not feel comfortable, he should not sign the photographs indicating it was him.

In discussing many of the robberies, Vaughan explained he would park his Jeep Cherokee some distance from the bank and would ride his mountain bike to and from the bank. Vaughan explained different disguises he used, such as a piece of pantyhose stuck to his face with double-sided tape. He stated that he eventually stopped using a disguise because he realized no one in the bank was paying attention to him anyway.

In discussing the April 29, 2005 bank robbery in Las Vegas, Nevada,[3] Vaughan stated that he robbed the bank so he would have money to travel back to Colorado. The agents then

---

[2]This took place at a bank robbery in Cheyenne, Wyoming on August 27, 2004. This robbery was discussed with FBI Agents, but was not specifically offered by the government as evidence under Fed. R. Evid. 404(b).

[3]Bank robbery number 13 *infra* Section I.C.

asked why he robbed a bank in Boulder, Colorado on May 2, 2005.[4]  Vaughan stated that he

needed money to travel back to Las Vegas with his girlfriend around May 3, 2005.  Earlier in the

interview, however, Vaughan stated that the last bank robbery took place on May 2, 2005, and he

drove from his home to Boulder just to do the robbery, and then drove back home.[5]

Vaughan explained that, at the end of May, he moved to Las Vegas with his girlfriend

and was looking for a fresh start.  He intended to gamble full-time, and did not feel he would

need to rob any more banks because he was a good enough poker player to be able to make

around $500 per day.

At the end of the interview, Vaughan was given an opportunity to write an apology letter

to the bank tellers he robbed.  He prepared a written apology.  Vaughan was also given the

opportunity to call anyone he wished, and he called his girlfriend.  A summary of the bank

robberies to which defendant confessed are discussed in Section I.C. along with the

government's Rule 404(b) evidence.

### B.      Suppression Hearing

#### 1.      Special Agent Deen Abbott

FB Special Agent Deen D. Abbott testified that he helped execute a federal arrest warrant

on defendant at his home in Las Vegas for charges of bank robbery in Arizona.  Abbott testified

that the officers introduced themselves at defendant's home, the arrest took place without

confrontation or incident, and Abbott transported defendant to the FBI office in Las Vegas.

Abbott testified that he also assisted Special Agent Richard L. Beasley with his

---

[4]Bank robbery number 14 *infra* Section I.C.

[5]Doc. 132, Gov't Ex. 3, at 2.

interview of Vaughan at the FBI office on this date, June 29, 2005. Upon arrival at the FBI

office, agents led Vaughan to an interview room, gave him a soft drink, and told him he could

use the restroom if necessary. The agents cuffed one of Vaughan's hands to the chair to ensure

their safety. From Abbott's training and experience, he testified that defendant did not appear to

be under the influence of alcohol, drugs, or mental illness. Vaughan's speech was coherent, and

he appeared to have no difficulty understanding or communicating with the agents.

Agents Abbott and Beasley produced a FD 395 Advice of Rights form, setting out

defendant's *Miranda* rights, which the agents read and handed to defendant for his review.[6]

Vaughan signed the form at 6:11 p.m. on June 29, 2005. The interview lasted "several hours,"

with no breaks, and Vaughan never gave any indication he wanted an attorney.

Abbott testified that the FBI frequently works with other police departments to compile

information regarding unsolved robberies with a similar modus operandi ("MO"), so they can

chart crime patterns. The FBI sent bank robbery surveillance photos to other divisions. Bank

robbery coordinators then looked at the pictures and determined whether it appeared like the

same bank robber. The FBI provided a physical description of defendant to police departments

and requested they report back with any unsolved robberies for which the FBI might question the

defendant. Area departments reported to the FBI with lists and surveillance photos of robberies

in which the robber's appearance was similar to that of defendant, and in which the robber may

have used a bicycle. In Abbott's experience in his jurisdiction, he stated the use of a bicycle in a

bank robbery may have been as low as 5% of bank robberies.

Abbott testified that neither he nor Agent Beasley made any promises in return for

---

[6]Agent Abbott testified that the agents either read it with defendant, or read it to defendant before handing him a copy. Either way, defendant both heard the form read aloud and was able to review a copy of it.

Vaughan's statements, and never used coercive tactics or threats. The tone remained casual, and neither agent was armed at the time of the interview. Moreover, Vaughan never expressed a desire to stop the interview. Vaughan appeared relaxed, and his recall of events was very clear. The agents would provide a picture, and Vaughan would supply the details of the robbery.

About twenty or thirty minutes into the interview, Abbott stated that the conversation changed from a casual discussion about Vaughan's background and the agents' investigation techniques, to Vaughan admitting participation in various robberies. Abbott explained that Vaughan' decision to confess appeared to be a "spontaneous change of mind." At this point, Vaughan began answering questions and took control of the conversation. During this discussion, Vaughan appeared very comfortable, laughed on occasion, and even appeared to be bragging. Vaughan told the agents that he realized he should not be talking to them, as the evidence against him was slim. Abbott testified that the agents never pressured Vaughan to admit to particular robberies, never promised him a lighter sentence if he confessed, and never offered a favorable deal in exchange for his confession.

Abbott testified that Vaughan indicated that he had prior experience with law enforcement, as he was arrested in Utah on matters relating to a drug crime. Vaughan explained that he had asked officers in Utah if he could cooperate with them against his drug supplier and work out a reduced sentence. He asked the Las Vegas FBI Agents if he could work out a similar deal with them.[7] Abbott testified that neither he nor Agent Beasley stated they would be willing to work out a deal with defendant. They informed him that he had already been charged.

Abbott testified that his memory of the interview with Vaughan was very clear, as he was

---

[7]Abbott testified that this suggestion was initiated by Vaughan, not Special Agent Abbott or Beasley.

an exceptional character.  When encouraging Vaughan that it might be in his "best interests" to wrap all the charges into one case, Abbott intended to convey to Vaughan that he might be able to seek a global plea agreement and avoid multiple trials in various states, but Abbott did not instruct Vaughan that he would first need to confess to the crimes.  Abbott explained that they discussed the possibility of a global plea agreement before discussing the bank robberies to help Vaughan "understand the federal system and what he has ahead of him."

Abbott informed Vaughan there was an Arizona criminal complaint against him.  He explained the nature of the evidence against Vaughan, including pictures in which Vaughan appeared to be at various other crimes scenes.  The agents searched Vaughan's residence after he was arrested, but Agent Abbott did not remember telling Vaughan that they had found incriminating evidence at his residence.  Abbott did not recall ever discussing criminal penalties with the Vaughn.

## 2.    Defendant Albert Lawrence Vaughan

Vaughn testified that there were nearly ten officers at his residence at the time of his arrest.  When he was arrested, Agent Abbott placed him in handcuffs and seated him in the patrol car.  He remembered that he was "in a daze" and was not sure what was going on, but he could hear officers speaking over the patrol radio about evidence of a hat found in the house that may have been used in a bank robbery.

Vaughan testified that he was handcuffed throughout the interview.  He stated that the agents did most of the talking, and although he could not remember most of what they said, he recalled that they promised him a global plea and informed him that they were the only ones who could get it.  He testified that he tried to tell the agents he wanted to wait for an attorney before

he decided, but they told him no one else could get the global plea for him.

Vaughan testified that he was not panicked, but he felt very "rattled" by the experience. He testified that he knew he had committed some bank robberies, and he knew he wanted to get through whatever time he might be required to serve. He testified that he has little experience with the law and no knowledge of what penalties might be imposed for various crimes, but he recalled agents telling him something about twenty years for each bank robbery. He testified that the only reason he confessed to the agents was to get the global pea agreement. He stated that he was under the impression that if he did not confess, he would face a serious sentence.

### 3.    Special Agent Richard L. Beasley

FBI Special Agent Richard Beasley, who interviewed Vaughan on June 29, 2005, also testified. Beasley testified that the agents told defendant "there were a lot of moving parts" to a global plea agreement, and the agents would need to include him, his attorney, and all prosecutors in the various states in any discussion of such an agreement. He stated that he and Agent Abbott did not represent that they could provide a global plea for the Vaughan, but that a statement might be the first step toward a global plea.

Beasley testified that Vaughan never appeared outwardly rattled. He appeared to have a "poker face," and waited for the agents to explain his options before he stated, "let's go." The possibility of a global plea may have encouraged Vaughan to make a statement, but Agent Beasley testified that such a deal was never promised.

### C.    *The Bank Robberies*

The government has listed thirteen bank robberies, in addition to the sole bank robbery

charged in the indictment, which the government would like to present evidence of at trial.[8]  The

government seeks admission of those robberies that Vaughan has confessed to, or made

admissions about, arguing that this constitutes admissions of a party in interest about matters that

are intrinsic to the one bank robbery charged in this case.  In deciding whether evidence of any,

some or all of these thirteen bank robberies is admissible as evidence under Fed. R. Evid. 404(b),

or whether defendant's statements regarding these robberies are admissible, the Court reviews

the facts briefly.  Defendant is presently charged with the bank robbery listed as number seven

below.  The government seeks to introduce evidence of the following bank robberies:

    1.     March 3, 2003, BIG THOMPSON FEDERAL CREDIT UNION,
         746 North Cleveland Avenue, Loveland, Colorado.

    2.     September 8, 2003, COMMUNITY NATIONAL FIRST BANK,
         426 South Link Lane, Fort Collins, Colorado.

    3.     May 27, 2004, FIRST COMMUNITY BANK,
         151 South College Avenue, Fort Collins, Colorado.

    4.     July 10, 2004, THE HOME STATE BANK,
         3227 South Timberline Road, Fort Collins, Colorado.

    5.     September 30, 2004, US BANK,
         9801 West Charleston, Las Vegas, Nevada.

    6.     October 2, 2004, BANK OF COLORADO,
         2903 Patterson Road, Grand Junction, Colorado.

---

[8]In its Rule 404(b) Notice (Doc. 64), the government included a copy of defendant's statements to FBI Agents on June 29, 2005.  As part of defendant's statement, he discussed three other bank robberies not specifically listed or separately discussed in the government's Rule 404(b) Notice: (1) a robbery in late-May 2005, in Colorado Springs, Colorado; (2) a robbery on August 27, 2004, at Security First Bank, 2501 East Lincolnway, in Cheyenne, Wyoming; and (3) a robbery on August 13, 2004, at Western Bank, 5538 Yellowstone Highway, in Cheyenne, Wyoming.  Because the government has not specifically proffered these three bank robberies as potential evidence under Rule 404(b), the Court will not discuss them either.  The Court finds little probative value where the government has not specifically developed the similarities these three bank robberies might have with the charged crime in the present case.  Thus, any probative value they may have is far too minimal to outweigh the danger of unfair prejudice.

**7.      October 15, 2004, FIRST BANK OF KANSAS,**
**1333 W. Crawford, Salina, Kansas.**

8.      February 11, 2005, US BANK,[9]
10140 S. Eastern Avenue, Henderson, Nevada.

9.      February 26, 2005,[10] DOWNEY SAVINGS AND LOAN,
3240 Stockton Hill Road, Kingman, Arizona.

10.     March 5, 2005, CITIBANK,
10211 South Eastern Avenue, Henderson, Nevada.

11.     March 10, 2005, BUSINESS BANK OF NEVADA,
2320 E. Tropicana Avenue, Las Vegas, Nevada.

12.     March 18, 2005, BEEHIVE CREDIT UNION,
1227 East 100 South, St. George, Utah.

13.     April 29, 2005, COMMUNITY BANK OF NEVADA,
2887 S. Maryland Parkway, Las Vegas, Nevada.

14.     May 2, 2005, FIRST NATIONAL BANK,
2120 Broadway, Boulder, Colorado.

Of the fourteen bank robberies listed above, defendant unequivocally confessed to nine of

the robberies by either initialing a surveillance picture provided by the agents or by explaining

the details of how he performed the robbery.[11]  Defendant made equivocal statements regarding

---

[9]The Government's Rule 404(b) Notice refers to this bank as "Citibank."  (Doc. 64 at 6.)  The memorandum report of defendant's statement to FBI Agents, refers to this bank as "US Bank."  (Doc. 132, Gov't Ex. 3).  The address, however, is the same for both.

[10]The Government's Rule 404(b) Notice inconsistently cites the date of this bank robbery as either February 26, 2005, or February 25, 2005.  (Doc. 64 at 7.)  The memorandum report of defendant's statement to FBI Agents cites the date as February 26, 2005.  (Doc. 132, Gov't Ex. 3.)

[11]Defendant unequivocally confessed to the following bank robberies: March 3, 2003 in Loveland, Colorado (No. 1); May 27, 2004 in Fort Collins, Colorado (No. 3); September 30, 2004 in Las Vegas, Nevada (No. 5); February 11, 2005 in Henderson, Nevada (No. 8); February 26, 2005 in Kingman, Arizona (No. 9); March 5, 2005 in Henderson, Nevada (No. 10); March 10, 2005 in Las Vegas, Nevada (No. 11); April 29, 2005 in Las Vegas, Nevada (No. 13); May 2, 2005 in Boulder, Colorado (No. 14).

three of the bank robberies,[12] and the September 8, 2003 robbery in Fort Collins, Colorado (No. 2) was never discussed with defendant at all.[13]  Finally, defendant denies any involvement in the Salina bank robbery with which he is presently charged.[14]  Most of the robberies involved the presence of a baseball cap, the use of a semiautomatic handgun, a verbal demand for money, and a bicycle as an escape vehicle.

The factual similarities between the thirteen robberies and the Salina robbery charged in this case are summarized in the table below:

| Bank Robbery | Statement to FBI Agents | Weapon | Statements in Bank at Time of Robbery | Disguise Used | Money Placed | Violence Used | Escape Vehicle |
|---|---|---|---|---|---|---|---|
| **#1** (3/3/03 CO) | Confessed | black semi-automatic pistol | "Get on the floor and no one will get hurt" | Dressed like a girl with a blonde wig, long women's jacket, and black gloves; pantyhose pulled over face | | pushed a female teller away from her drawer | |
| **#2** (9/8/03 CO) | No statement | semi-automatic handgun | "Give me all your money" | | left hand | put his arm around elderly woman's neck and held weapon to her head | |
| **#3** (5/27/04 CO) | Confessed | silver-colored pistol | "Get your money out" or "Get the money out of your drawer" | tan scarf over face | under his shirt or into his pocket[15] | | |

---

[12]Defendant made equivocal statements regarding the occurrence of the following bank robberies: July 10, 2004 in Fort Collins, Colorado (No. 4); October 2, 2004 in Grand Junction, Colorado (No. 6); March 18, 2005 in St. George, Utah (No. 12).

[13]Defendant made no statement regarding the September 8, 2003 bank robbery in Fort Collins, Colorado (No. 2).

[14]Defendant has denied any involvement in the October 15, 2004 bank robbery in Salina, Kansas (No. 7).

[15]Defendant's memory was different than the facts presented by the government.  He recalled putting the money in his pocket.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **#4**<br>(7/10/04 CO) | Equivocal | black semi-automatic pistol | "Give me your money! I'm not kidding!" and "I'll take this, you can keep the rest!" | blue baseball cap with Denver Broncos logo; nylon-type fabric taped over lower half of his face | | | fled on bicycle |
| **#5**<br>(9/30/04 NV) | Confessed | black semi-automatic handgun | "Give me all the money from your top and second drawers." Demanded more. | brown/tan hat; pantyhose taped to his face | picked up money | | mountain bike |
| **#6**<br>(10/2/04 CO) | Equivocal | black pistol | Told employees to give him "all the money." Stated he also wanted money from the bottom drawer. | black/khaki baseball cap with a second bill pulled down to cover his mouth | stuffed cash down the front of his jeans | | royal blue mountain bike |
| **#7**<br>(10/15/04 KS) | Denied | semi-automatic handgun | Demanded "all the money" and directed tellers to "hurry up." Told tellers to empty drawers near drive-through window. Told people to "Stop laughing, it's not funny." | black baseball cap with a second bill pulled down to cover his mouth; also wore clear thin gloves | stuffed cash down the front of his pants | fired gun into back cabinet | left on a bicycle |
| **#8**<br>(2/11/05 NV) | Confessed | black semi-automatic handgun | "Give me all your money" and "This is not a joke." "Even the bottom drawer too." "That's it?" | dark or green baseball cap | put money in jacket pocket | | did not use bike because parking lot was full; left in a white van |
| **#9**<br>(2/26/05 AZ) | Confessed | black semi-automatic handgun | "This is a robbery. Give me all the money in the top and bottom drawers. Don't push any buttons." "Everything in the bottom drawer." "You have to have more than this." "Go to the vault." "This isn't good. This isn't good." | dark-colored baseball cap | lifted his shirt and stuffed money and gun into waistband | | mountain bike |
| **#10**<br>(3/05/05 NV) | Confessed | gun | Instructed teller to give him "all the cash, not the bait bills." Told teller "You did a very good job." | black baseball cap | picked up money and put in pockets | | mountain bike |
| **#11**<br>(3/10/05 NV) | Confessed | handgun | "This is not a game, don't be stupid, give me all the money out of your top drawer." Also asked for money in teller's second and third drawers. | black and red baseball cap | put the gun and money in his pants | | bike |
| **#12**<br>(3/18/05 UT) | Equivocal | black semi-automatic handgun | Ordered the teller to give him all her money from her top and bottom drawers. | dark-colored baseball cap | put money in pants[16] | | bicycle |

[16](Doc. 87 at 7.)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **#13**<br>(4/29/05<br>NV) | Confessed | black semi-automatic pistol | "Give me all the money from the top drawer." Demanded all the $100s from beneath the drawer. | white baseball cap | stuffed money in pants[17] | | yellow and black mountain bike |
| **#14**<br>(5/2/05<br>CO) | Confessed | black handgun | Made verbal robbery demand. Threatened the teller that he would use the gun if necessary and he was serious. | white baseball cap | put cash in pockets[18] | | mountain bike |

Defendant is presently charged with one count of armed bank robbery at the First Bank of Kansas, in Salina, Kansas on October 15, 2004 (No. 7 above). The facts of the robbery are taken from the police report.[19] On October 15, 2004, the First Bank of Kansas in Salina, Kansas was robbed by a young, white male with tan skin,[20] believed to be between the ages of twenty-five and twenty-eight years old, standing 5'6" to 5'8" tall, with brown hair, a clean haircut, and light-colored trimmed mustache, with a small amount of light-colored hair on his chin. One witness stated that the man's face was partially covered by a baseball cap with "Starter 71" written on the front left side, and the bill of another cap, which he pulled down over his nose and mouth as he approached the counter. Four bank tellers were present at the time of the robbery. The robber approached one of the tellers ("first teller") standing immediately behind the counter and demanded "all the money." The teller thought he was joking and said "that's not funny." The man then repeated himself and directed her to "hurry up." When she failed to respond, he pulled out a semi-automatic handgun and pointed it at her face. Another teller nearby ("second teller") directed the first teller to give the robber the money in her cash drawer. As the second teller

---

[17](Doc. 87 at 7.)

[18](Doc. 87 at 6–7.)

[19](Doc. 129, Attach. 1.)

[20]In watching the surveillance video, one officer reported that the suspect "appears to be a white or hispanic male." (Doc. 129, Attach. 1.)

watched the bank robber, she noticed that the cap covering his nose and mouth would occasionally fall to reveal his face. The robber fired his gun into a cabinet against the wall behind the two tellers. He then directed the other two tellers to empty the cash drawers near the drive-through window and pointed to the other cash drawers as well. As the money was brought to the counter, the robber put his gun away and began stuffing the cash down the front of his pants. He wore clear, thin gloves on his hands. When the drawers were emptied, he left the bank on a bicycle. Throughout the encounter, witnesses said he appeared "extremely nervous, shaking uncontrollably, and talking very fast." Multiple times, he said, "Stop laughing, it's not funny."

The facts of the Grand Junction bank robbery on October 2, 2004 (No. 6 above) are substantially similar to the Salina bank robbery and warrant a more thorough discussion. At approximately 8:55 a.m., on October 2, 2004, a man robbed the Bank of Colorado at 2903 Patterson Road, Grand Junction, Colorado. Three employees were the only other individuals in the bank when the robbery occurred. The man was described by witnesses as a white male in his late 20's to early 30's, approximately 5'8" to 5'10" tall, and 170 to 185 pounds, with blonde hair and blueish-green eyes. He was light-complected and clean-shaven, and was wearing blue jeans, a light green shirt, and a baseball cap. One bank employee described the cap as black with a gray bill. Another bank employee described the cap as khaki with a gray bill. The third bank employee stated the cap had "Starter 71" written on its left side. Two of the bank employees stated that upon entering the bank, the suspect reached to the bill of his cap and pulled down what appeared to be a second bill which covered his face. He then reached behind his back and removed a black pistol. He told the employees to give him "all the money." One bank employee

stated they placed the money from the top drawer on the counter. The robber then stated he also wanted the money from the bottom drawer, and they complied. He then stuffed all of the loose cash down the front of his jeans and left the bank. Throughout the course of the robbery, he was polite and repeatedly apologized to the employees. He fled the scene on a royal blue mountain bike, and was last seen riding behind the Safeway supermarket which shares a parking lot with the bank. The bank lost $21,636.14.

After defendant's arrest on June 29, 2005, FBI Agents asked if he had committed any robberies in Grand Junction, Colorado on October 2, 2004. Defendant stated that he robbed a bank in Grand Junction that day. He left Las Vegas and was staying at a motel in Grand Junction. He played pool at a pool hall in Grand Junction located on North Main Street. The bank he robbed was located by a King Soopers, and he recalled there were three young girls working as bank tellers. The three tellers gave defendant so much money that he asked them to stop and left some money on the counter. Defendant recalled getting approximately $20,000 from that bank robbery.

When shown photographs of the Salina bank robbery, defendant stated that he did not commit any robberies in Kansas. He explained that he had gotten $20,000 during the Grand Junction robbery so he would have had no reason to rob a bank in Kansas only a few weeks later. Defendant stated that he never robbed the same bank twice.

## II.     Defendant's Motion to Suppress Statement to FBI Agents

Defendant asks the Court to suppress statements he made to FBI Agents following his arrest on June 29, 2005, because they were the product of coercion and involuntarily made. He states that he was questioned for hours without counsel, and promised leniency only if he

16

confessed to all the robberies. The government, on the other hand, argues defendant's statements were voluntary, as defendant was advised of his rights and was given an FD 395 Advice of Rights form, which he signed. He was given the opportunity to call anyone he wished, and the interview, lasting only a few hours, never became hostile or threatening. Defendant even laughed on occasion.

"The Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary."[21] In determining whether a defendant's statements were made voluntarily, a court must decide whether, under the totality of the circumstances, "his will has been overborne and his capacity for self-determination critically impaired."[22] The court, therefore, must look at both (1) the details of the interrogation, and (2) the characteristics of the accused.[23] "[A] confession is only involuntary when 'the police use coercive activity to undermine the suspect's ability to exercise his free will.'"[24] "Thus, in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary."[25] In fact, the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion."[26] "Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the

---

[21]*United States v. Williams*, 576 F.3d 1149, 1162 (10th Cir. 2009) (citing *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006)).

[22]*Lopez*, 437 F.3d at 1063 (quoting *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993))

[23]*Id.* (quoting *United States v. Toles*, 297 F.3d 959, 965–66 (10th Cir. 2002)).

[24]*United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999) (citing *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998)).

[25]*United States v. Brown*, Case No. 09-40048-01-SAC, 2009 WL 2777350, at * 5 (D. Kan. August 31, 2009) (citing *Lugo*, 170 F.3d at 1004).

[26]*Oregon v. Elstad*, 470 U.S. 298, 304–05 (1985).

most damning admissions."[27]

If, however, the government "obtains incriminating statements through acts, threats, or promises which cause the defendant's will be to overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt."[28]  A promise of leniency made by officers in exchange for a confession is "relevant to determining whether a confession was involuntary."[29]  However, the Tenth Circuit has held that a confession is not coerced merely because "the officer promises to make a defendant's cooperation known to prosecutors"[30] or gives similar "limited assurance[s]."[31]  The Fourth Circuit has stated that a general discussion of the "gravity of [a defendant's] suspected offenses and the benefits of cooperation under the federal system" are not specific promises of leniency such as constitute coercion.[32]  Moreover, "[a] confession [is] not coerced merely because the police did not inform Defendant of all the potential charges that could be brought against him,"[33] or merely because

---

[27]*United States v. Washington*, 431 U.S. 181, 187 (1977).

[28]*Lopez*, 437 F.3d at 1063 (quoting *Toles*, 297 F.3d at 965).

[29]*Id.* at 1064 (quoting *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997)).

[30]*Id.* at 1065 (citing *United States v. Roman-Zarate*, 115 F.3d 778, 783–84 (10th Cir. 1997)).

[31]*United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994) (holding that the Special Agent's promises of consideration for defendant's cooperation was a limited assurance that did not make the subsequent statements involuntary).  *But see Lopez*, 437 F.3d at 1064–65 (noting that an officer's promise to reduce a potential sentence from 60 years to 6 years if defendant cooperated, was a promise of leniency and, when combined with officers' misrepresentations of the evidence against him, was coercive).

[32]*United States v. Mashburn*, 406 F.3d 303, 310 (4th Cir. 2005) (citing *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987) ("General encouragement to cooperate is far different from specific promises of leniency.")).  In *Mashburn*, officials informed defendant that he faced a potential 10-year sentence, but might be able to have it reduced if he cooperated.  *Id.* at 309–10.  The Fourth Circuit concluded that "[a]ny coercion that [defendant] may have felt was not the product of official action, but rather the consequence of the severity of the offenses he chose to commit."  *Id.* at 310 (citing *Oregon v. Elstad*, 470 U.S. 298, 304–05 (1985)).

[33]*United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998) (citing *United States v. Braxton*, 112 F.3d 777, 783–84 (4th Cir.), *cert. denied*, 522 U.S. 874 (1987)).

officers discussed "realistic penalties for cooperative and non-cooperative defendants,"[34] or merely because officers "misrepresented to a suspect the strength of the evidence against him."[35] However, a combination of the above-listed factors may create a coercive environment when considered under the totality of the circumstances.[36] Finally, an officer's promise of immunity in return for a statement by the accused is a specific promise that may be coercive in itself.[37]

If the court determines that coercive tactics were used by the officers, then it must next consider the personal characteristics of the defendant to determine whether his will was overborne.[38] In making this evaluation, the court considers the following: "(1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment."[39]

Defendant argues that he was led to believe that the "global plea agreement" was his only hope of leniency, and such a deal could only be secured by the FBI Agents speaking to him. He

[34]*United States v. Ponce Munoz*, 150 F. Supp. 2d 1125, 1136 (D. Kan. 2001) (quoting *United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994)).

[35]*United States v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006) (quoting *Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997)).

[36]*See Clanton*, 129 F.3d at 1151, 1159. In *Clanton*, the officer lied about the strength of the evidence against defendant, and told defendant he would get a twenty-five year sentence if he did not confess, but would "get off lightly" if he confessed. *Id.* at 1157. The Court noted, "[t]hough the lies themselves [about the strength of the evidence against defendant] are not unconstitutional, a reasonable official should have been aware that adding the lies to the apparent promises [of leniency and an opportunity to "get off lightly"] would make it more likely that the confession would be considered involuntary." *Id.* at 1159.

[37]*See Shortwell Mfg. Co. v. United States*, 371 U.S. 341, 348 (1963); *United States v. Fountain*, 776 F.2d 878, 885 (10th Cir. 1985).

[38]*Lopez*, 437 F.3d at 1064 (quoting *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998)).

[39]*Id.* (citing *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999)).

testified that he was "rattled" and unfamiliar with legal institutions.  Thus, he argues, when the

agents offered him a global plea deal, and insisted that only they could secure such a deal, he felt

compelled to confess.  The Court finds that defendant's testimony at the suppression hearing

lacked credibility.  The casual and thorough accounts given by defendant during the FBI

interview contrast starkly with defendant's characterization of it at the suppression hearing.

During the interview, defendant laughed multiple times, and told the FBI Agents he "knew" he

should not be talking to them because they did not have sufficient evidence against him.  He

even tried to negotiate a deal with the FBI in exchange for his testimony.  At the hearing, both

Agent Abbott and Agent Beasley testified that defendant appeared calm and collected, he spoke

intelligently, and recalled events with amazing detail, even to the point that he appeared to be

bragging about his bank robberies.

 Neither officer brandished a weapon or physically threatened the defendant or the

defendant's family.  The agents informed the defendant of his constitutional rights before the

interview began, and defendant signed the FD 395 Advice of Rights form.[40]  Agent Abbott

testified that, within 20–30 minutes, the tone of the interview changed abruptly, wherein

defendant began speaking openly about his prior involvement in various bank robberies.  The

Court further finds the duration of questioning leading up to defendant's confession was very

short.

 Although the agents testified inconsistently regarding whether they discussed potential

---

[40]*See United States v. Fountain*, 776 F.2d 878, 886 (10th Cir. 1985) ("A defendant's act of signing a waiver
form prior to confession, though not conclusive, is 'usually strong proof' of the voluntariness of the waiver.") (citing
*North Carolina v. Butler*, 441 U.S. 369 (1979)*; United States v. Smyer*, 596 F.2d 939 (10th Cir. 1979); *Blasingame
v. Estelle*, 604 F.2d 893 (5th Cir. 1979)).

criminal penalties defendant might face for robbery,[41] neither agent promised a specific sentence reduction in exchange for defendant's confession. Standing alone, general statements about potential penalties for specific crimes does not render the FBI questioning coercive in this case. No one offered defendant immunity. And any discussion of a "global plea agreement" was spoken of generically, rather than in terms of its specific contents. Agent Abbott testified that the agents explained that any possible "global plea" would need to be discussed with various persons and prosecutors. Furthermore, Agent Abbott testified that *defendant* initiated a request for leniency in exchange for his confession when he informed agents that he had previously been offered such a deal by officials in Utah. Agent Abbott testified that he declined to make such a promise.

The Court notes the lucidity of defendant's statements to Agents Abbott and Beasley, going far beyond a mere admission of involvement in criminal conduct, and becoming a tale of defendant's exploits. Defendant commented on poor security at banks, and volunteered to the agents that he had "discovered ways the banks could improve their security." Moreover, the Court notes that defendant is a man of business experience, previously worked for Hewlett Packard and subsequently ran his own computer business. Throughout the interview, when defendant expressed uncertainty as to whether he had committed a particular robbery, the agents advised him *not* to initial the picture, and defendant subsequently exercised the liberty to deny involvement in specific robberies. The Court finds that no coercive tactics were used by the agents such as might overbear the free will of the defendant in this case. His statements to

---

[41]Special Agent Abbott did not recall anyone discussing criminal penalties, but Special Agent Beasley stated they may have informed defendant that he could face a maximum sentence of twenty years. Defendant also testified that the agents told him one count of bank robbery could result in a 20-year sentence.

Agents Abbott and Beasley were freely and voluntarily given. The government has met its burden of showing voluntariness by a preponderance of the evidence. Defendant's Motion to Suppress Statements is denied.

## III. Defendant's Motion in Limine Regarding Prior Bad Acts

Even though defendant's statements are party admissions under Fed. R. Evid. 801(d), and thus not hearsay, they must also meet the requirements of Fed. R. Evid. 404(b) if they "reveal or suggest prior criminal conduct."[42] In this case, defendant has been charged with one armed bank robbery in Salina, Kansas, a crime he has denied committing. Defendant has confessed, however, to multiple bank robberies that took place in other states. If the government, then, seeks to admit defendant's statements regarding the other bank robberies, it must show how such evidence is relevant to an issue in this trial.[43] Thus, the next issue is whether defendant's confession and evidence of other bank robberies are admissible for any relevant purpose under Fed. R. Evid. 404(b), as evidence of prior and subsequent bad acts.

Defendant asks the Court to prohibit the government from introducing in its case-in-chief evidence relating to other bank robberies allegedly committed by defendant, defendant's statements regarding other bank robberies, his confession to other bank robberies, his conviction or pending charges for bank robbery, and any other evidence relating to other bank robberies. The government argues that defendant was involved in thirteen other bank robberies between March 3, 2003 and May 2, 2005, using methods, weapons, transportation, or attire similar to that

---

[42]*United States v. Oberle*, 136 F.3d 1414, 1418 (10th Cir. 1998) (citing *United States v. Maden*, 114 F.3d 155, 157 (10th Cir.), *cert. denied*, 522 U.S. 889 (1997)).

[43]"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

used in the Salina robbery with which defendant is presently charged.  When defendant was arrested June 29, 2005, he confessed to committing many, but not all, of these robberies.  The government argues such evidence is admissible at trial.

First, the government contends that evidence of the thirteen other robberies does not fall under the exclusionary rule of Fed. R. Evid. 404(b) because such evidence is intrinsic to the Salina bank robbery with which defendant is presently charged.  Fed. R. Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . [44]

The Tenth Circuit has held the exclusion of Rule 404(b) only applies to evidence of other acts extrinsic to the crime charged.[45]  Generally, evidence is *intrinsic* if it "is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury,"[46] but it is *extrinsic* if it "is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense."[47]  Evidence of other acts is intrinsic to the crime charged, and does not come within the scope of Rule 404(b), if "it was part of the scheme for which a defendant is being prosecuted,"[48] or "so 'inextricably intertwined' with the crime

---

[44]Fed. R. Evid. 404(b).

[45]*United States v. Record*, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989) (citing *United States v. Orr*, 864 F.2d 1505, 1510 (10th Cir. 1988)).

[46]*United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009).

[47]*Id.* (citing Thomas M. DiBiagio, *Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other-Crimes Evidence Disconnected to the Fundamental Right to a Fair Trial*, 47 SYRACUSE L. REV. 1229, 1231 (1997)).

[48]*Record*, 873 F.2d at 1372 n.5 (citing *Orr*, 864 F.2d at 1510).

charged that the testimony concerning the charged act 'would have been confusing and incomplete without mention of the prior act.'"[49]

The government argues that evidence of the thirteen robberies is intrinsic evidence because it is necessary to "complete the story"[50] of defendant's "one-man crime wave" to supplement his gambling.[51]  The government supports its argument by citing to cases involving the admissibility of evidence found intrinsic to charges of misapplication of bank funds,[52] conspiracy,[53] illegal gambling business,[54] and mail fraud.[55]  In these cases, however, the courts found evidence of prior acts intrinsic to the crime charged because the crime charged was some kind of criminal enterprise.[56]

Here, however, defendant has been charged with one count of armed bank robbery at the First Bank of Kansas, in Salina, Kansas, in violation of 18 U.S.C. § 2113(a) and (d), and one

_____

[49]*United States v. Treff*, 924 F.2d 975, 981 (10th Cir. 1991) (quoting *United States v. Richardson*, 764 F.2d 1514, 1521-22 (11th Cir. 1985)); *see also United States v. Jeffrey*, 128 F. App'x 680, 698–99 (10th Cir. 2005) ("Rule 404(b) only applies to acts extrinsic to the crime charged.  Evidence of acts intrinsic to, inextricably intertwined with, or a *necessary preliminary* to the crime charged, is admissible.") (citing *United States v. Green*, 175 F.3d 822, 831 (10th Cir. 1999); *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993) (emphasis added)).

[50](Doc. 50 at 24–25.)

[51](Doc. 50 at 2.)

[52]*United States v. Engstrom*, 965 F.2d 836 (10th Cir. 1992).

[53]*See United States v. Record*, 873 F.2d 1363 (10th Cir. 1989); *United States v. Royal*, 972 F.2d 643 (5th Cir. 1992); *United States v. Heinemann*, 801 F.2d 86 (2d Cir. 1986); *see also United States v. Johnson*, 182 F. App'x 423, 429–30 (6th Cir. 2006) (upholding trial court's decision to admit evidence of a prior bank robbery as intrinsic to a charge of *conspiracy* to commit bank robbery).

[54]*Sanabria v. United States*, 437 U.S. 54 (1978).

[55]*United States v. Stouffer*, 986 F.2d 916 (5th Cir. 1993); *United States v. Soliman*, 813 F.2d 277 (9th Cir. 1987); *United States v. Anzalone*, 783 F.2d 10 (1st Cir. 1986).

[56]*See United States v. Thompson*, Case No. 07-CR-0008-CVE, 2007 WL 756712, at *1 (N.D. Okla. March 8, 2007) (noting that "an act done in furtherance of an alleged conspiracy is not an 'other act' under Rule 404(b); it is part of the conspiracy itself" (citing *United States v. Molina*, 75 F.3d 600, 602 (10th Cir. 1996)).

count of knowingly and intentionally possessing and discharging a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).[57] Even if defendant's "crime spree," a string of robberies over a two-year period, was motivated in part by a desire to supplement his gambling, evidence of thirteen other robberies is not intrinsic to the Salina bank robbery. It is possible that evidence of gambling is relevant to the bank robbery in this case to show motive to commit bank robbery, but gambling is not intrinsic to the bank robbery ("inextricably intertwined" or "a *necessary preliminary* to the crime charged").[58] Furthermore, the government does not seek to admit evidence of defendant's gambling, but of his prior and subsequent bank robberies, which the government strings together by means of a "gambling" explanation. The Court notes that the government was able to lay out the facts of each bank robbery in separately lettered sections, without significant internal cross-references. Under the facts of this case, evidence of one bank robbery weeks before, or months after, the Salina bank robbery is not intrinsic to the bank robbery with which defendant is presently charged. Therefore, the Court finds evidence of other robberies is extrinsic to the crime charged and subject to Rule 404(b).

The government argues in the alternative that the prior and subsequent acts are admissible under Rule 404(b) because they tend to show defendant's knowledge, motive, intent,

---

[57](Doc. 1.)

[58]*United States v. Jeffrey*, 128 F. App'x 680, 698–99 (10th Cir. 2005) (citing *United States v. Green*, 175 F.3d 822, 831 (10th Cir. 1999)) (emphasis added); *see also Thompson*, 2007 WL 756712, at *4 (holding that "evidence concerning defendant's alleged stealing of getaway cars to commit the robberies charged in this case is intrinsic to the crimes charged" and "admissible independent of Rule 404(b)," but "[e]vidence concerning defendant's alleged use, possession, and sale of narcotics is admissible" under Rule 404(b) and only "to show financial need and motive to rob the banks").

preparation, plan, and identity.[59]  In considering evidence under Rule 404(b), the Supreme Court

case *Huddleston v. United States*[60] instructs courts to weigh four factors: (1) whether the

evidence is offered for a proper purpose, (2) whether it is relevant, (3) whether the probative

value is not substantially outweighed by its potential for unfair prejudice, and (4) whether the

court provided a limiting instruction at defendant's request.[61]  "Whether evidence is relevant for

a permissible purpose under Rule 404(b) is left to the discretion of the trial court."[62]  The Court

addresses each factor in turn.

### A.    *Proper Purpose*

Under the first factor, "[t]he government must precisely articulate a proper purpose for

the evidence, and the trial court must specifically identify the proper purpose for which it is

admitted."[63]  "Evidence is admitted for a proper purpose if allowed for one or more of the

---

[59]It is generally acknowledged that Fed. R. Evid. 404(b) applies equally to acts occurring before the crime charged and acts occurring after the crime charged.  *See United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000).

[60]485 U.S. 681, 691 (1988).

[61]*United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006) (citing *Huddleston v. United States*, 485 U.S. 681, 691 (1988); *Zamora*, 222 F.3d at 762).  In *United States v. Robinson*, 978 F.2d 1554 (10th Cir. 1992), the Tenth Circuit "urged trial courts to determine that the proffered evidence":

> (1) tends to establish intent, knowledge, motive, identity, or absence of mistake or accident;
> (2) is so related to the charged offense that it serves to establish intent, knowledge, motive, identity, or absence of mistake or accident;
> (3) has real probative value and not just possible worth;
> (4) is close in time to the crime charged; and
> (5) even if relevant, be excluded if the probative value is substantially outweighed by the danger of unfair prejudice.

*Id.* at 1559.

[62]*Robinson*, 978 F.2d at 1561 (citing *United States v. Harrison*, 942 F.2d 751, 759 (10th Cir. 1991)).

[63]*United States v. Delay*, No. 03-40055-01-SAC, 2004 WL 433808, at *1 (D. Kan. Feb. 6, 2004) (citing *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985), *cert. denied*, 474 U.S. 1081 (1986)).

enumerated purposes in Rule 404(b)."[64] "[I]f the other act evidence is relevant and tends to prove a material fact other than the defendant's criminal disposition, it is offered for a proper purpose under Rule 404(b) and may be excluded only under Rule 403."[65]

The government argues that the prior and subsequent acts tend to show defendant's knowledge, motive, intent, preparation, plan, and identity. "Knowledge is at issue when a defendant claims he denies participation in and awareness of a criminal act."[66] Here, however, defendant is not arguing he was "ignorant" of the illegality of his conduct.[67] Rather, he argues that he did *not* commit the bank robbery with which he is presently charged.

"Motive" is not relevant to this case either. In *United States v. Thompson*,[68] the trial court admitted evidence of defendant's drug addiction to show that he had a financial need that would provide a motive to commit the bank robbery.[69] Here, by contrast, the government seeks to admit evidence of one bank robbery as a "motive" for another. The Court finds that evidence of one bank robbery does not demonstrate a motive to commit a second bank robbery. Furthermore, the Court is unconvinced that gambling was the defendant's underlying "motive" or "plan" for each of the thirteen bank robberies. Defendant told FBI Agents that he robbed his first bank "just to see if he could do it," and he continued robbing banks "because he enjoyed the

---

[64]*Mares*, 441 F.3d at 1156.

[65]*United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) (citing *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001)).

[66]*Delay*, 2004 WL 433808, at *2.

[67]*See Mares*, 441 F.3d at 1159 (finding "knowledge" and "plan" both proper purposes to admit evidence of prior drug trafficking, as it showed defendant knew she was smuggling drugs on the occasion in question).

[68]Case No. 07-CR-0008-CVE, 2007 WL 756712, at *3–*4 (N.D. Okla. March 8, 2007).

[69]*Id.*

rush he got from it,"[70] reasons having nothing to do with gambling. He stated that he occasionally needed money to supplement his gambling, but he also stated that he decided to quit robbing banks in 2005 because he wanted to "gamble full-time." Such reasoning is inconsistent. At times, he robbed a bank just so he would have money to travel from one destination to the next, and occasionally he would supplement his gambling income by "pawni[ng] items." The government has failed to demonstrate how the string of thirteen robberies establishes a consistent "plan" or "motive." If financial necessity were the only reason for the Salina bank robbery with which he is presently charged, the defendant has already explained that he had no reason to commit the Salina bank robbery because he already had $20,000 from a Grand Junction bank robbery only weeks before. Therefore, the Court finds "motive" and "plan" are not proper purposes under Rule 404(b).[71]

Furthermore, the government has failed to show a "common plan" or "larger scheme" present in all fourteen robberies. Each robbery has distinct facts, different disguises, or no disguise. The perpetrator used different phrases when he entered the bank, and tucked the money in different locations on his body. The government has not shown the defendant used any particular or consistent method in selecting banks, and although defendant may have worked with an accomplice, the nature of his or her relationship to defendant is unknown. In summary, the government has not demonstrated an overarching scheme throughout all fourteen bank

---

[70]Doc. 132, Gov't Ex. 3.

[71]In *United States v. Smith*, 264 F. App'x 730, 733 (10th Cir. 2008), the court admitted evidence of defendant's prior trips to other banks under Rule 404(b) to show defendant was "preparing," "planning," or "intending" to commit a particular bank robbery. *Id.* at 733. Here, however, the government has failed to show how defendant's prior or subsequent bank robberies prepared him for the Salina bank robbery, or demonstrated any particular plan or intention on his part to commit the Salina bank robbery.

robberies.[72]

Evidence of the thirteen other bank robberies does not show defendant "knew" he committed the Salina bank robbery, it does not show defendant's "motive" to commit the Salina bank robbery, it does not show defendant's "intent" to commit the Salina bank robbery, or any specific "preparation" or "plan" to commit the Salina bank robbery. The government has failed to show that any of these theories is factually "at issue" in this case. The only proper purpose for which such evidence might be admitted is "identity."[73] Defendant has denied any involvement in the Salina bank robbery and the government seeks to show enough similarities between the thirteen bank robberies defendant is alleged to have committed and the Salina bank robbery at dispute in this case to prove that defendant was the man who committed the Salina robbery. As the government has identified a proper purpose for the evidence to be admitted, the Court will balance the remaining *Huddleston* factors in light of their utility in showing identity.

### B.    Relevance

Evidence is "relevant" under the second factor if it "tends to prove or disprove one of the elements necessary to the charged offense."[74] Under the relevance prong, the prior acts need not be identical, but "must share similarity with the charged crime"[75] and be sufficiently "close in

---

[72]*See United States v. McGuire*, 27 F.3d 457, 460–61 (10th Cir. 1994) (noting the work of defendant's accomplices and the specific planning strategy used by the group in preparing for seven other bank robberies to show that the charged robbery was part of a larger common scheme or plan).

[73]*See United States v. Gutierrez*, 696 F.2d 753, 755 (10th Cir. 1982) (finding evidence of subsequent bank robbery admissible to show identity in presently charged bank robbery); *United States v. Haslip*, Case No. 96-10071-01/02, 1997 WL 18179, at *1–*2 (D. Kan. Jan. 6, 1997) (finding evidence of prior bank robbery admissible to show identity in presently charged bank robbery).

[74]*United States v. Mares*, 441 F.3d 1152, 1156–57 (10th Cir. 2006).

[75]*Id.* at 1157 (citations omitted) (citing *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000); *Gutierrez*, 696 F.2d at 755).

time and similar in method" to the charged crime to have probative value.[76]  Moreover, when evidence is offered to show identity by *modus operandi*, it must have a "signature quality."[77] "[B]ased on a 'totality of the comparison,'" the acts should "share enough elements to constitute a 'signature quality.'"[78]  In determining whether a "signature quality" exists, the court considers the following non-exhaustive factors: (1) geographic location, (2) the unusual quality of the crime, (3) the skill necessary to commit the acts, or (4) use of a distinctive device.[79]  The court will also generally consider whether the prior acts occurred closely in time and geographical proximity to the charged act, whether the prior acts and the charged offense share similar physical elements, and whether the charged offense and the other acts are part of a common scheme.[80]  Furthermore, the Tenth Circuit explained,

> the weight to be given to any one element and the number of elements
> necessary to constitute a "signature" are highly dependent on the
> elements' uniqueness in the context of a particular case.  In other words, a
> few highly unique factors may constitute a "signature," while a number of
> lesser unique factors "although insufficient to generate a strong inference
> of identity if considered separately, may be of significant probative value

---

[76]*United States v. Morgan*, 936 F.2d 1561, 1572 (10th Cir. 1991) (citing *United States v. Record*, 873 F.2d 1363, 1375 (10th Cir. 1989)).

[77]*Mares*, 441 F.3d at 1159 n.3 (citing *United States v. Oberle*, 136 F.3d 1414, 1419 (10th Cir. 1998)); *see also Gutierrez*, 696 F.2d at 755; *United States v. Porter*, 881 F.2d 878, 887 (10th Cir. 1989) (noting that "evidence of another crime need not be identical to the crime charged, but need only be similar and share with it 'elements that possess 'signature quality.'") (citing *Gutierrez*, 696 F.2d at 755).  For a more thorough discussion of cases in which courts admitted evidence of other bank robberies under Rule 404(b) on the issue of identity, see R.P. Davis, Annotation, *Admissibility, in Robbery Prosecution, of Evidence of Other Robberies*, 42 A.L.R. 2D 854 (originally published in 1955).

[78]*United States v. Shumway*, 112 F.3d 1413, 1420 (10th Cir. 1997) (citations omitted).

[79]*Id.* (citations omitted).

[80]*Mares*, 441 F.3d at 1158 (citations omitted).

when considered together."[81]

Defendant need not be convicted of the prior act before a court may admit evidence of its

signature quality under Rule 404(b),[82] but the court "must decide whether from the evidence 'the

jury could reasonably find'–that the defendant committed or participated in the prior []

violations–'by a preponderance of the evidence.'"[83]

The bank robbery charged in the present indictment occurred in Salina, Kansas on

October 15, 2004.[84]  The suspect was described as a young, white male, twenty-five to twenty-

eight years old, standing 5'6" to 5'8" tall, and wearing a baseball cap with "Starter 21" on the

front left side.  Underneath the cap was the bill of another cap, which the suspect pulled down

over his nose and mouth to disguise his face.  He pulled out a semi-automatic handgun and

demanded "all the money."  Multiple times, he stated, "Stop laughing, it's not funny."  Then,

demonstrating familiarity with banks, he instructed the tellers to "empty the cash drawers near

the drive-through window."  The man then stuffed the cash down the front of his pants, left the

bank, and rode off on a bicycle.

The facts of the Grand Junction, Colorado bank robbery[85] are remarkably similar to the

Salina robbery, and took place only thirteen days before the Salina robbery in a neighboring

_____

[81]*Shumway*, 112 F.3d at 1420 (citing *United States v. Myers,* 550 F.2d 1036, 1045 (5th Cir.1977)); *see* 1 MCCORMICK ON EVIDENCE § 190 (6th ed.) (noting that evidence of other crimes may be admitted to show identity if the crimes are "so nearly identical in method as to earmark them as the handiwork of the accused").

[82]*United States v. Andreopoulus*, Case No. 2:08-CR-24 TS, 2009 WL 2750464, at *2 (D. Utah August 25, 2009) (citing *Gutierrez*, 696 F.2d 755 n.2; *United States v. Dowling*, 493 U.S. 342, 348–49 (1990)).

[83]*United States v. Delay*, Case No. 03-40055-01-SAC, 2004 WL 433808, at *3 (D. Kan. Feb. 6, 2004) (citing *Huddleston v. United States*, 485 U.S. 681, 690–91 (1988)); *see also United States v. Tan*, 254 F.3d 1204, 1208 n.2 (10th Cir. 2001).

[84]*See* bank robbery No. 7 *supra* Section I.C.

[85]*See* bank robbery No. 6 *supra* Section I.C.

state.  The suspect in the Grand Junction robbery was described as a young, white male, in his late 20's to early 30's, standing 5'8" to 5'10" tall, and wearing a baseball cap with "Starter 21" written on the left side.  Underneath the cap was the bill of another cap, which the suspect pulled down to disguise his face.  He pulled out a black pistol and demanded "all the money."  Then, demonstrating familiarity with banks, he instructed the teller he also wanted the money from the bottom drawer.  He stuffed the cash down the front of his pants, left the bank, and rode off on a mountain bike.

The Court finds that the facts of the bank robbery in both crimes were nearly identical: both robbers wore a "Starter 71" hat; both robbers pulled down a second bill from under their hats to disguise their faces; both robbers pulled out a handgun, demanded "all the money" and then instructed the tellers to search particular drawers for more money; both robbers stuffed the money down the front of their pants; both robbers retreated on foot and used a bicycle as their escape vehicle.  These parallel facts, coupled with the geographic and temporal proximity between the two robberies (taking place in neighboring states only thirteen days apart), are sufficient to create a signature quality giving the Grand Junction bank robbery probative value on the issue of the identity of the Salina bank robber.  The elements are sufficiently numerous and similar to justify an inference that the same person perpetrated both bank robberies.

Although defendant did not explicitly confess to committing the bank robbery at Bank of Colorado on October 2, 2004, he stated that he "robbed a bank in Grand Junction" on October 2, 2004, and he recalled that the bank was near a King Soopers, he recalled there were three women working as bank tellers at the time of the robbery, and he recalled leaving with approximately $20,000.  The government proffered that, in the Grand Junction bank robbery, three employees

were present at the time of the robbery and the robber left with $21,636.14. The accounts given

by the government and the defendant in this case are substantially similar. Thus, the government

has met its burden of showing by a preponderance of the evidence that defendant is more likely

than not the individual who committed the Grand Junction bank robbery on October 2, 2004.

While each fact standing alone may seem insignificant (wearing a baseball cap, using a

handgun, demanding "all the money," directing tellers to search particular drawers, stuffing

money and a handgun down the front of his pants, using a bicycle to escape), they collectively

reveal a pattern used by the bank robber, and demonstrate the robber's familiarity with where

bank tellers store cash. Instead of using a bag, the robber consistently stuffed the money into the

front of his pants. Additionally, the Court finds the robber's use of a second baseball bill to

disguise the noes and mouth is an element of signature quality. When this fact is combined with

the uncommon use of a bicycle to escape, the close geographic and temporal proximity between

the two bank robberies,[86] and the similar physical description given by eye witnesses, the Grand

Junction robbery has significant probative value on the issue of the identity of the Salina bank

robber.

Beyond this bank robbery, however, the Court finds any factual similarities are tenuous

and inconsistent, such that the danger of unfair prejudice substantially outweighs the probative

value other bank robberies may have on the issue of identity. Many of these robberies share a

---

[86]*See United States v. Ace*, Case No. 05-40096-01-SAC, 2007 WL 1834009, at *5 (D. Kan. June 26, 2007) (finding two years and four months between the charged offense and the prior act was "not an inherently unacceptable length of time"). In considering temporal and geographic proximity, the Court is also considering the nature of the crime at issue in this case. Armed bank robbery is a serious offense and a dangerous crime that takes place in the public arena. Thus, a person may not commit multiple armed bank robberies with the same frequency or in the same geographic radius in which a person might commit multiple private drug offenses. *See United States v. Massey*, 48 F.3d 1560, 1571–72 (10th Cir. 1995) ("'[T]here is no absolute rule regarding the number of years that can separate offenses. Rather, the court applies a reasonableness standard and examines the facts and circumstances of each case.'") (quoting *United States v. Cuch*, 842 F.2d 1173, 1178 (10th Cir. 1988)).

number of common features, such as use of a gun, specific demands for money, instructions to search specific drawers, stuffing the money into his waistband, and using a bicycle as a getaway vehicle. However, the Court notes that none of these factors is sufficiently unique to be considered the type of signature conduct that is probative of identity under Rule 404(b). In fact, the disguises used by the suspect often varied. In one robbery, the suspect dressed as a woman, and in other robberies the suspect used a scarf or a piece of nylon to disguise his face. This fact makes such robberies *distinct* from the Salina robbery, rather than more similar to it, as no nylon or wig was used in the Salina robbery.

In the Government's Supplement to Its Response,[87] the government lists robberies by category, using very broad criteria. In one list, the government categorizes robberies in which the suspect "made a verbal demand for money and threatened the teller with a gun," but such a fact is far too generic to constitute a "signature" bank robbery. The government groups bank robberies in which the suspect stuffed the money "down his pant[s], in his pockets, or in his jacket pockets," but this list takes too broad a sweep. The government also lists robberies in which the suspect had a "similar [physical] description," but the descriptions vary as widely as husky/stocky/medium/average built, anywhere from 130 to 185 pounds and 20 to 40 years old, and any height from 5'4" to 6'3" tall.

Because the government has failed to establish a signature quality between the remaining bank robberies and the Salina robbery, the Court finds they are not sufficiently similar to be probative on the issue of identity under the third *Huddleston* factor. Thus, only evidence of the Grand Junction bank robbery is probative on the issue of identity in this case.

---

[87](Doc. 87.)

## C.     Probative Value vs. Unfair Prejudice

Under the third factor, the Court must apply the Fed. R. Evid. 403 balancing test, whereby "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Unfair prejudice means "'an undue tendency to suggest decision on an improper basis,' commonly an emotional one, wholly apart from the accused's guilt or innocence of the crime charged."[88] Exclusion of evidence under Rule 403 "'is an extraordinary remedy and should be used sparingly.'"[89]  The Tenth Circuit has explained that the "unfair prejudice" contemplated by Rule 403 "does more than damage the Defendant's position at trial."[90]  The court went on to explain:

> [R]elevant evidence of a crime which the government must introduce to prove its case is by its nature detrimental to a defendant who asserts that he is not guilty of the charged offense.  In the Rule 403 context, however, "[e]vidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocense of the crime charged."  Even if this type of prejudice is found, it must *substantially* outweigh the probative value of the evidence in order to be excluded under Rule 403.[91]

Here, the Court finds that any probative value present in the evidence of twelve other bank robberies, many of which only share common elements with the Salina bank robbery in this case, would be substantially outweighed by unfair prejudice to the defendant.  Most of the bank

---

[88]*United States v. Delay*, 03-40055-01-SAC, 2004 WL 433808, at *3 (D. Kan. Feb. 6, 2004) (citing *United States v. Tan*, 254 F.3d 1204, 1211–12 (10th Cir. 2001)).

[89]*Tan*, 254 F.3d at 1211 (quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999)).

[90]*Id.*

[91]*Id.* at 1211–12 (citing *Rodriguez*, 192 F.3d at 951) (emphasis in original) (internal citations omitted).

robberies demonstrate generic qualities similar to all bank robberies in general so that their probative value on the issue of the bank robber's identity in the present case is minimal.

Even if defendant confessed to many of the robberies, the factual similarities between each robbery and the Salina robbery were too generic to give them probative value in this case. Any probative value they may have is *substantially* outweighed by its potential to unfairly prejudice the trial and mislead the jury on the issue of defendant's guilt or innocence in the case of the Salina bank robbery. Such overwhelming evidence would push a juror to the conclusion that defendant had a propensity to commit bank robberies, a conclusion that Rule 404(b) is specifically designed to prevent.

Moreover, although defendant made admissions about some of the robberies proffered by the government, some of his admissions were equivocal only. Equivocal statements or partial admissions have far less probative when the issue being considered is the identity of the person robbing the Salina bank, based on the identity of the person robbing the other banks. Admitting even partial or equivocal admissions about numerous robberies, particularly when those admissions are not highly probative of the key issue of identity, would have an overwhelmingly prejudicial effect.

In contrast, however, the Court finds the Grand Junction bank robbery shares a significant set of facts substantially similar to the Salina bank robbery, and both robberies involved the use of a distinctive device: a disguise created out of a second baseball cap bill to cover the suspect's nose and mouth. Furthermore, the Grand Junction robbery occurred in close geographic and temporal proximity to the Salina robbery, and involved a suspect of similar physical description and attire. Both robbers wore a "Starter 71" cap and used a bicycle as their

escape vehicle. Although a bicycle may not be "signature" when considered alone, Agent Abbot

testified that, based on his experience, the use of a bicycle as a getaway vehicle was fairly

uncommon. Perhaps only occurring in 5% of bank robberies in the region. When coupled with

multiple other factors, a signature quality emerges between the Grand Junction and the Salina

bank robberies.

Considered in its totality, the particular combination of elements in the Salina and Grand

Junction bank robberies is sufficiently unique to indicate a "signature quality," making the Grand

Junction bank robbery highly probative on the issue of the identity of the person who robbed the

Salina bank. Although defendant did not unequivocally confess to committing the Grand

Junction bank robbery, he recited the facts of the robbery in his confession to FBI Agents and

stated that he committed a bank robbery in Grand Junction on October 2, 2004. These facts

permit a reasonable juror to conclude that defendant was the person who committed the Grand

Junction bank robbery.[92]

The Grand Junction bank robbery has probative value outweighing the danger of unfair

prejudice. Thus, the Court finds that evidence of the Grand Junction bank robbery is admissible

under the balancing test of Rule 403, but solely as it relates to the issue of identity. Evidence of

all other bank robberies, however, is inadmissible.

Appropriately, the Court will issue a limiting instruction when evidence of the Grand

Junction bank robbery is presented, instructing the jury that 404(b) evidence is only to be

considered for the proper purpose for which it is admitted. This instruction will reduce the

---

[92]*See Tan*, 254 F.3d at 1208 n.2 ("In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.") (quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988)).

danger of unfair prejudice or confusion of the issues. Evidence of all remaining bank robberies, however, is inadmissible. To admit evidence of the twelve other bank robberies, in which the probative value is minimal, would likely to compel the jury to make a decision on an improper basis. Before the government actually presents evidence regarding the Grand Junction bank robbery, it is cautioned to review the Court's ruling and make sure the evidence presented is consistent with the facts as it has proffered them to the Court.

## IV.    Rule 609 Evidence

Finally, defendant argues the evidence regarding defendant's prior conviction for bank robbery is inadmissible to impeach him under Fed. R. Evid. 609 should he testify, because evidence of robbery does not involve dishonesty or false statement, and the probative value of any such evidence is substantially outweighed by its prejudicial effect. The government argues that defendant's prior bank robbery conviction is admissible for impeachment purposes under Rule 609 should he testify, because it involved a felony less than ten years old and tends to affect his credibility.[93]

Under Fed. R. Evid. 609, certain evidence may be admitted to attack a witness's character for truthfulness:

> (1) . . . evidence that an accused has been convicted of [a crime punishable by death or imprisonment in excess of one year under the law under which the witness was convicted] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
>
> (2) evidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that

---

[93]The government states in its brief that it reserves for trial any Fed. R. Evid. 608(b) ruling, relating to cross-examination of a witness regarding specific instances of conduct relating to a witness's character for truthfulness or untruthfulness. (Doc. 50 at 34 n.1.)

> establishing the elements of the crime required proof or admission of an
> act of dishonesty or false statement by the witness.[94]

Under Rule 609(a)(2), the Tenth Circuit has held that "crimes like burglary, robbery, and theft are not automatically admissible under Rule 609(a)(2)."[95]  In looking at subsection 609(a)(1), however, the government bears the "burden of proving that the probative value of the prior convictions for impeachment purposes exceed[s] the prejudicial effect of their admission."[96]

The Court reserves any ruling on this issue until the matter arises at trial.  The Court cautions the government not to mention any prior convictions in its opening statement, and any such evidence will not be admitted until the government has proffered to the Court, outside the presence of the jury, evidence such as would qualify the conviction for admissibility under the requirements of Rule 609.[97]

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to Suppress Statement (Doc. 62) is **denied.**

**IT IS FURTHER ORDERED BY THE COURT** that defendant's Motion in Limine Regarding Prior Bad Acts (Doc. 44) is **granted in part and denied in part.**  Only evidence of the bank robbery at Bank of Colorado on October 2, 2004 in Grand Junction, Colorado (No. 6 above) is admissible at trial per Rule 404(b) as probative on the issue of identity.  The Court

---

[94]Fed. R. Evid. 609(a).

[95]*United States v. Dunson*, 142 F.3d 1213, 1215 (10th Cir. 1998) (quoting *United States v. Mejia-Alarcon*, 995 F.2d 982, 988–89 (10th Cir. 1993)) (noting, however, that a prior conviction involving "some elements of deceit, untruthfulness, or falsification which would tend to show that an accused would be likely to testify untruthfully," is admissible).

[96]*United States v. Gross*, 603 F.2d 757, 758 (10th Cir. 1979) (citing cases).

[97]This includes evidence that not "more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date . . ." and requires a showing that the probative value of such evidence outweighs the prejudicial effect.  Fed. R. Evid. 609(b).

finds that evidence, *including defendant's admissions* of any other bank robbery listed in the

government's 404(b) Notice (Doc. 64) is inadmissible, as the probative value of such evidence is

substantially outweighed by the danger of unfair prejudice.

**IT IS FURTHER ORDERED BY THE COURT** that any decision on the admissibility

of prior convictions under Fed. R. Evid. 609 will be addressed at the time of trial.

**IT IS SO ORDERED.**

Dated:  November 12, 2009

          S/ Julie A. Robinson           
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE