## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff/Respondent,** | ) | |
| | ) | **Case No. 05-CR-40157-JAR-01** |
| **v.** | ) | **Case No. 13-CV-4022-JAR** |
| | ) | |
| **ALBERT LAWRENCE VAUGHAN,** | ) | |
| | ) | |
| **Defendant/Petitioner.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Albert Lawrence Vaughan's Motion under

28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Doc.

216).  In his motion, Petitioner seeks relief on several grounds that he was denied effective

assistance of counsel.  The Government has responded (Doc. 219) and Vaughan has filed a reply

(Doc. 222).  After a careful review of the record and the arguments presented, the Court denies

Vaughan's motion without further evidentiary hearing.

## I.      Legal Standards

### A.      General

Under § 2255(a):

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws
> of the United States, or that the court was without jurisdiction to
> impose such sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to collateral
> attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

According to Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States

District Courts:

> The judge who receives the motion must promptly examine it.  If it
> plainly appears from the motion, any attached exhibits, and the
> record of prior proceedings that the moving party is not entitled to
> relief, the judge must dismiss the motion. . . .

An evidentiary hearing must be held on a § 2255 motion "unless the motion and files and

records of the case conclusively show that the prisoner is entitled to no relief."[1]  Petitioner must

allege facts which, if proven, would warrant relief from his conviction or sentence.[2]   An

evidentiary hearing is not necessary where the factual allegations in a § 2255 motion are

contradicted by the record, inherently incredible, or when they are conclusions rather than

statements of fact.[3]

A district court may grant relief under § 2255 if it determines "that the judgment was

rendered without jurisdiction, or that the sentence imposed was not authorized by law or

otherwise open to collateral attack, or that there has been such a denial or infringement of the

constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."[4]

"Review under § 2255 is not an alternative to appellate review for claims that could have been

presented on direct appeal but were not."[5]  A movant may overcome this procedural bar by

---

[1] 28 U.S.C. § 2255(b).

[2] *See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996).

[3] *Arredondo v. United States,* 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)); *see also Hatch*, 58 F.3d at 1471 ("the allegations must be specific and particularized, not general or conclusory"); *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims which are merely conclusory in nature and without supporting factual averments).

[4] 28 U.S.C. § 2255.

[5] *United States v. Magleby*, 420 F.3d 1136, 1139 (10th Cir. 2005), *cert. denied,* 547 U.S. 1097 (2006).

showing either of "two well recognized exceptions."[6]  First, the movant must show good cause

for not raising the issue earlier and actual prejudice to the movant's defense if the issue is not

considered.[7]  Cause may "be established by showing that counsel rendered constitutionally

ineffective assistance."[8]  Second, the "failure to consider the federal claims will result in a

fundamental miscarriage of justice."[9]

### B.     Ineffective Assistance of Counsel

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall

enjoy the right . . . to have the Assistance of Counsel for his defence."[10]  A successful claim of

ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v.*

*Washington*.[11]  First, a defendant must show that his counsel's performance was deficient in that

it "fell below an objective standard of reasonableness."[12]  To meet this first prong, a defendant

must demonstrate that the omissions of his counsel fell "outside the wide range of professionally

competent assistance."[13]  This standard is "highly demanding."[14]  Strategic or tactical decisions

---

[6]*United States v. Cervini,* 379 F.3d 987, 990 (10th Cir. 2004), *cert. denied*, 544 U.S. 904 (2005).

[7]*Id.*

[8]*United States v. Wiseman,* 297 F.3d 975, 979 (10th Cir. 2002) (citations omitted).

[9]*Cervini,* 379 F.3d at 990 (quoting *Coleman v. Thompson,* 501 U.S. 722, 750 (1991)); *see Bousley v. United States,* 523 U.S. 614, 621–22 (1998) (holding that a showing of actual innocence meets the fundamental miscarriage of justice prong).

[10]U.S. Const. amend. VI; *Kansas v. Ventris*, 556 U.S. 586 (2009).

[11]466 U.S. 668 (1984).

[12]*Id.* at 688.

[13]*Id.* at 690.

[14]*Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

on the part of counsel are presumed correct, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."[15]  In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[16]  Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error; "every effort should be made to 'eliminate the distorting effects of hindsight.'"[17]

Second, a defendant must also show that his counsel's deficient performance actually prejudiced his defense.[18]  To prevail on this prong, a defendant "must show there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[19]  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."[20]  This, in turn, requires the court to focus on "the question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."[21]  A defendant must demonstrate both *Strickland* prongs to establish a

---

[15]*Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted).

[16]*Strickland*, 466 U.S. at 689.

[17]*Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

[18]*Strickland*, 466 U.S. at 687.

[19]*Id*. at 694.

[20]*Id*.

[21]*Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[22]

Finally, Vaughan appears *pro se*. Therefore, his pleadings are to be construed liberally and not to the standard applied to an attorney's pleadings.[23] If a petitioner's motion can be reasonably read to state a valid claim on which he could prevail, the court should do so despite a failure to cite proper legal authority or follow normal pleading requirements.[24] However, it is not "the proper function of the district court to assume the role of advocate for the *pro se* litigant."[25] For that reason, the court shall not supply additional factual allegations to round out a petitioner's claims or construct a legal theory on his behalf.[26]

## II.    Procedural Background

FBI Agents arrested Petitioner at his home in Las Vegas, Nevada, on June 29, 2005, on a federal arrest warrant from Arizona for bank robbery in Arizona.[27] On July 13, 2005, a federal grand jury in Nevada indicted Petitioner on five counts of bank robbery in Nevada; he plead guilty to those charges on April 4, 2007, and he was sentenced on September 28, 2007.[28]

On December 28, 2005, while the Nevada charges were pending, Petitioner was indicted

---

[22]*Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (quoting *Strickland*, 466 U.S. at 697) ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

[23]*Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[24]*Id.*

[25]*Id.*

[26]*See Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997).

[27]Doc. 174, Tr. Mot. Hr'g at 6–9, 41.

[28]Doc. 219, Ex. A; Doc. 187, PSIR ¶¶ 37–43.

by the Topeka, Kansas grand jury on charges of bank robbery and using a firearm during the commission thereof, for a bank robbery that occurred on October 15, 2004 in Salina, Kansas.[29] Agents arrested him on the federal warrant in this case on October 16, 2007.[30]  Prior to trial, the Government gave notice that it intended to introduce evidence of a robbery that occurred in Grand Junction, Colorado as well as twelve other robberies purportedly committed by Petitioner, under Fed. R. Evid. 404(b).[31]  This Court granted Petitioner's motion to exclude as to each robbery except the Grand Junction robbery, finding that it was sufficiently similar to the Salina robbery that evidence was probative on the issue of identity of the Salina bank robbery.[32] Petitioner's trial began on May 3, 2010,[33] and on May 7, 2010, a jury convicted Petitioner on both counts.[34]  This Court sentenced Petitioner to a total term of 198 months' imprisonment, to include a 78-month term on Count 1, and a consecutive 120-month term on Count 2.[35]

Petitioner appealed his conviction to the United States Court of Appeals for the Tenth Circuit, which affirmed.[36]  Petitioner then timely filed this 28 U.S.C. § 2255 motion, asking this

---

[29]Doc. 1.

[30]Doc. 219, Ex. A.

[31]Doc. 64.

[32]Doc. 136.  Following his conviction in this case, Petitioner plead guilty to bank robbery charges in the districts of Arizona, Utah, and Colorado.  *United States v. Vaughan*, 525 F. App'x 871 (10th Cir. 2013).

[33]Doc. 163.

[34]Doc. 169.

[35]Doc. 189.

[36]*United States v. Vaughan*, 450 F. App'x 757 (10th Cir. 2011).  The issues on appeal were limited to whether evidence of the Grand Junction bank robbery and the apology letter written by Petitioner after his arrest were improperly admitted under Fed. R. Evid. 404(b). *Id.*

Court to overturn these convictions and set aside his sentence.[37]

## III.    Facts of the Case and Trial Proceedings

On October 15. 2004, at approximately 2:49 p.m., Petitioner robbed the First Bank of

Kansas located in Salina, Kansas.[38]  He entered the bank and approached a teller, Renee Ritten,

stating, "give me your money."[39]  Ritten replied, "you've got to be joking."[40]  Petitioner

answered, "no, give me your money."[41]  Ritten again replied, "you're joking," at which point

Petitioner produced a firearm, aimed it at Ritten's face, and remarked, "I am not joking, I want

your money."[42]  Petitioner then fired the weapon into a nearby file cabinet.[43]  He demanded

money from both drawers that Ritten had control over.[44]  Ritten produced the money from both

drawers and placed it on the counter, while pulling the "bait trap" and pushing the necessary

buttons to alert law enforcement.[45]

_____

[37]Petitioner did not file a petition for certiorari in the United States Supreme Court, so his conviction became final ninety days after the Tenth Circuit entered its judgment denying his appeal, or March 12, 2012. *See United States v. Prows*, 448 F.3d 1223, 1227 (10th Cir. 2006) ("In the context of the one-year limitation period for filing a § 2255 motion, a criminal conviction becomes final when the Supreme Court affirms it on direct review, denies certiorari, or (in the absence of a certiorari petition) at the time for filing a certiorari petition expires.").  The Government concedes that although Petitioner filed his motion more than one year past this date, on March 14, 2013, he certified that he mailed it on March 12, 2013, which makes it timely under the prison mailbox rule.  *See* Doc. 216 at 13; *Price v. Philpot*, 420 F.3d 1158, 1163–64 (10th Cir. 2005) (applying prison mailbox rule).

[38]Doc. 204, Trial Tr. at 225–26; Doc. 205, Trial Tr. at 29.

[39]Doc. 205 at 29.

[40]*Id.*

[41]*Id.*

[42]*Id.*

[43]*Id.* at 29, 123–24.

[44]*Id.* at 31.

[45]*Id.* at 30.

Petitioner then ordered Ritten to retrieve money from the drive-thru teller's station.[46]
Ritten complied and made two trips to obtain the money from those drawers.[47]  Ritten placed the
money on the counter, at which point Petitioner bunched up the pile of money and stuffed it into
his pants.[48]  Petitioner then exited the bank, got on a bicycle, and rode away.[49]  He stole
approximately $9870.00.[50]

At the time of the robbery, there were four employees in the bank, and no customers.[51]
Each of the employees, Ritten, Michelle Lindeen, Carrianne Diederich, and Leslie Hunley,
observed the robbery from their respective vantage points.[52]

Michelle Lindeen observed Petitioner enter the bank wearing a sweatshirt with a dark
jacket over the top and blue jeans.[53]  She described Petitioner as a white male, wearing a baseball
cap, with the bill from another baseball cap pulled down covering his face, and also wearing
rubber gloves.[54]  Lindeen further described him as approximately twenty-five to thirty years old,
having a reddish-blonde goatee, blue eyes, short blonde hair, standing approximately five foot

---

[46]*Id.* at 32.

[47]*Id.* at 46–47.

[48]Doc. 204 at 236–37.

[49]Doc. 205 at 37, 78, 80, 113.

[50]*Id.* at 199–200.

[51]Doc. 204 at 230.

[52]*Id.* at 221–72; Doc. 205 at 4–21 (Lindeen); *Id.* at 22–60 (Ritten); *Id.* at 61–89 (Diederich); *Id.* at 90–118 (Hunley).

[53]Doc. 204 at 230.

[54]*Id.* at 225, 230, 236, 248, 269.

8

nine inches, and weighing approximately 160 pounds.[55]  Lindeen, who had been standing behind Ritten, observed the interaction between Petitioner and Ritten and immediately moved to her desk in order to trigger the alarm.[56]

From her vantage point at the desk, Lindeen had an unobstructed view of Petitioner.[57] During the robbery, Lindeen was able to observe Petitioner's face, as the removable bill had been pulled away by Petitioner.[58]  Lindeen subsequently picked Petitioner out of a photo line-up and further identified him at trial as the individual who robbed the bank.[59]

Ritten testified that she did not look directly at Petitioner in order to avoid being perceived as aggressive.[60]  Accordingly, Ritten was able to study Petitioner from the waist down, and described him as wearing a dark sweatshirt, light stonewashed jeans, and clear gloves "like the doctor's gloves."[61]  She remembered Petitioner's hair as "blondish," and that it was cut very short and military-like.[62]  Ritten described Petitioner as twenty to twenty-six years of age, five foot eight to five foot ten, and 145 to 160 pounds.[63]  Ritten was also able to describe Petitioner's baseball cap as a "Starter 71" cap, and that it had a second brim that he kept trying to hook over

---

[55]*Id*. at 250, 252, 269–70.

[56]*Id*. at 226, 231.

[57]*Id*. at 237, 247–48.

[58]*Id*. at 236–37; Doc. 205 at 17.

[59]Doc. 204 at 253–57; Doc. 205 at 19, 131–32.

[60]Doc. 205 at 32.

[61]*Id*. at 32–33.

[62]*Id*. at 38, 40.

[63]*Id*. at 40.

his ear to cover his face.[64]  She described the second brim as having been "cut off of another hat and just attached underneath so [Petitioner] could drop it," similar to a visor.[65]  She confirmed that the brim covering Petitioner's face "dropped a few times."[66]  Ritten was unable to identify Petitioner in a photo line-up.[67]

Carrieanne Diederich was working near the drive-thru window during the time of the robbery.[68]  Diederich overheard the interaction between Ritten and Petitioner and turned her attention toward the two.[69]  She observed Petitioner wearing a Starter cap with a cut-off bill covering part of his face.[70]  She further observed Petitioner was wearing rubber gloves, a dark sweatshirt and lighter pants.[71]  Diederich described Petitioner as between twenty and twenty-five years of age, about five foot eight inches tall, white, 175 pounds, with a blonde goatee and brownish-blonde hair.[72]  Like Ritten, she was unable to identify Petitioner in a photo line-up.[73]

Leslie Hunley was working the drive-thru at the time of the robbery.[74]  Hunley's attention

---

[64]*Id*. at 33–34.

[65]*Id*. at 34.

[66]*Id*.

[67]*Id*. at 41, 50.

[68]*Id*. at 63.

[69]*Id*. at 66–67.

[70]*Id*. at *Id*. at 67–68, 77.

[71]*Id*. at 68–69.

[72]*Id*. at 69, 78, 84.

[73]*Id*. at 80–81.

[74]*Id*. at 92–93.

was drawn toward the front where Ritten was located when she overheard a conversation that was getting louder.[75]  When Hunley looked, she saw Petitioner with a ball cap pulled down low and "the bill to another cap that somehow or another he had rigged to fit over his ears to cover the front part of his mouth."[76]  While Hunley was unable to get a good look at Petitioner's face, she described him as struggling with the cover over his face.[77]  Hunley also described Petitioner as twenty to twenty-five years of age, white, five foot eight, and 175 pounds.[78]  Like Diederich and Ritten, Hunley was unable to identify Petitioner in a photo line-up.[79]

At the time of the First Bank of Kansas robbery, Petitioner was engaged in a relationship with Leea Greenville, who met Petitioner in 2001 while she was attending veterinary school at Colorado State University, in Loveland, Colorado.[80]  During this time, Petitioner and Greenville lived in Loveland.[81]  Greenville testified that Petitioner departed on a six-week trip during October 2004, and that his intended destination was a poker tournament in Kansas City.[82]  Greenville testified that she was upset about Petitioner being gone during the month of October because she had a week-long break from school and his birthday was October 23.[83]  Greenville

---

[75]*Id*. at 96.

[76]*Id*.

[77]*Id*. at 103–04.

[78]*Id*. at 106.

[79]*Id*. at 107.

[80]*Id*. at 158–61.

[81]*Id*. at 158.

[82]*Id*. at 163–64.

[83]*Id*. at 164–65.

testified about a telephone conversation she had with Petitioner in October 2004, when he told her he was not coming back to Loveland and was going to stay in Kansas.[84]  She further testified about Petitioner's fondness for baseball caps, and that he wore one every day because he was starting to go bald.[85]

Greenville was shown a series of photographs from the First Bank of Kansas by the FBI, and recognized Petitioner as the person in the photographs.[86]  At trial, Greenville was shown Government exhibits 2 through 18, which were glossy photographs taken from surveillance cameras at the bank.[87]  Greenville identified Petitioner as the individual robbing the First Bank of Kansas.[88]

Over Petitioner's objection, this Court allowed the Government to present testimony concerning the October 2, 2004 robbery of the Bank of Colorado located in Grand Junction, Colorado.[89]  Three employees of the Bank of Colorado, Amber Salazar, Becky Reeves, and Carissa Kimble, testified as to what occurred during the robbery.

Amber Salazar testified that an individual entered the Bank of Colorado, pulled a firearm from the back of his pants, and stated "give me all your money."[90]  Salazar described the

---

[84]*Id.* at 165.

[85]*Id.* at 186.

[86]*Id.* at 168–69.

[87]*Id.* at 171.

[88]*Id.* at 171–73.

[89]*Id.* at 191; Doc. 206, Trial Tr. at 8, 18.

[90]Doc. 206 at 9.

individual as wearing a baseball cap that appeared to have a second bill flipped down to cover his face.[91]   Salazar described the individual as white, approximately five foot eight inches tall, 180 pounds, blonde hair, and very blue eyes.[92]   Salazar remarked that the individual asked for money out of both drawers at the teller station and thereafter stuffed the money down the front of his pants.[93]   She testified that other than the color of his shirt and the location of the two banks, she saw no difference between the man who robbed the Bank of Colorado thirteen days prior to robbing the First Bank of Kansas.[94]

Becky Reeves testified that she also saw the robber that day, and that he was wearing a baseball cap that said "Starter."[95]   Reeves testified that the individual pulled down a second bill from the cap that would cover his face.[96]   Reeves observed a large diamond stud in the individual's left ear.[97]   She saw the individual stuff the money down the front of his pants, exit the bank, get onto a mountain bike, and peddle away.[98]   Reeves described the individual as white, approximately five foot eight inches, 180 pounds, and having blue eyes.[99]   When shown photographs of the Salina robbery, Reeves remarked that the photographs depicted a robbery that

---

[91]*Id*. at 9, 21–22.

[92]*Id*. at 11–12.

[93]*Id*. at 13.

[94]*Id*. at 24.

[95]*Id*. at 34.

[96]*Id*. at 35.

[97]*Id*.

[98]*Id*. at 38–39.

[99]*Id*. at 39–40.

was "identical to what we experienced at our bank."[100]  She further indicated that three of the photographs from the Salina robbery showed a stud earring identical to what she saw the individual wearing in the Colorado robbery.[101]

Carissa Kimble also observed the robber and testified that "a split-second" after he entered the bank, he pulled down a second bill from his hat and produced a handgun.[102]  She observed "Starter 71" on the left side of the individual's ball cap, and that the pull down brim was gray in color.[103]  Kimble described the robber as five foot eight inches tall, 170 to 180 pounds, blonde-looking hair, and blue eyes.[104]  She also observed the individual exit the bank and get on a bicycle.[105]  When shown a photo from the Salina robbery, Kimble remarked that the hat was exactly the same hat she had observed the individual wearing in the Colorado bank robbery.[106]

In June 2005, Salazar, Reeves, and Kimble were shown a photo line-up that included a photograph of Petitioner.[107]  None of the three identified Petitioner from the photo array.[108]

On June 29, 2005, Petitioner was interviewed by FBI Agent Deen Abbott.  Agent Abbott

---

[100]*Id*. at 41.

[101]*Id*. at 42–43.

[102]*Id*. at 52–53.

[103]*Id*. at 56.

[104]*Id*. at 57, 66.

[105]*Id*. at 59–60.

[106]*Id*. at 61–62.

[107]*Id*. at 88.

[108]*Id*. at 88–89.

testified that during that interview Petitioner, while not saying he robbed the Bank of Colorado, confessed to robbing a bank in Grand Junction, Colorado on October 2, 2004.[109]  There were no other bank robberies in Grand Junction, Colorado on October 2, 2004, other than the Bank of Colorado robbery.[110]  When confronted about the bank robbery in Salina, Petitioner maintained that he did not commit that offense.[111]  Agent Abbott testified that at the conclusion of the interview, he gave Petitioner an opportunity to write an apology letter to the tellers, and identified Government Ex. 44 as the letter that Petitioner wrote "apologizing to the tellers."[112]

Petitioner called two witnesses on his behalf—Michelle Vaughan, his sister, and Jamey Sander, a longtime friend.[113]  Both Vaughan and Sander, while not knowing exactly where Petitioner was on October 15, 2004, maintained that he could not have robbed the First Bank of Kansas.  Vaughan testified that she and her brother were very close, their families spent most weekends together, and there was no way Petitioner could have gone on a six-week trip without her being aware of it.[114]  When shown  photographs from the Salina robbery, she testified that it was not her brother.[115]  She also testified that unless she heard it from her brother, she would not

---

[109]*Id.* at 128, 131–32, 144–45.

[110]*Id.* at 118–19.

[111]*Id.* at 134.

[112]*Id.* at 140; Gov't Ex. 44.  The letter written by Petitioner was admitted over objection under Fed. R. Evid. 403; the Court found the statement, "This makes me realize I probably have scared a few other people which I'm sorry about," was probative and not overly prejudicial. Doc. 206 at 138–39.

[113]Doc. 206 at 166–94.

[114]*Id.* at 171.

[115]*Id.* at 172.

believe that he had admitted to the FBI that he robbed a bank in Grand Junction on a weekend.[116]

Sander testified that in October 2004, Petitioner was living with her and her husband in

Berthoud, Colorado, and she did not recall him going out of town on an extended trip.[117]  Sander

testified that she and Petitioner always celebrated his birthday, and that they would have done so

in October 2004.[118]

## IV.    Discussion

Petitioner asserts three grounds for overturning his convictions: (1) his counsel was

ineffective by not raising a speedy trial violation; (2) his counsel was ineffective for failing to

raise the issues that Agent Abbott committed perjury at trial that and the prosecutor committed

"fraud on the court"; and (3) his counsel was ineffective by not investigating or producing

witnesses and documents that would have proved Petitioner's innocence.  The Court addresses

each claim in turn.

---

[116]*Id*. at 181–82.

[117]*Id*. at 184–85.

[118]*Id*. at 184.

A.     **Speedy Trial**

Petitioner contends that counsel ineffectively failed to move for dismissal of the Indictment based on the two and one-half year delay between his June 29, 2005 arrest in Nevada and his October 16, 2007 arrest on the Kansas charges.  Citing *Barker v. Wingo*,[119] Petitioner argues that he was denied his constitutional right to a speedy trial because "the government deliberately waited over two years after Albert's arrest on other charges to arrest him on these charges," and "[d]uring that two and one-half years, memories grew dim—exactly what the government needed to convict a man based on weak circumstantial evidence."[120]  By way of prejudice, he avers, "[h]ad the government promptly arrested Albert on these charges, he would have been appointed counsel to represent him and have been able to secure the documentation necessary to prove his innocence."[121]  He posits that this lapse in time prevented him from obtaining exculpatory evidence, including 1) business records from his brother's landscaping business in Loveland, Colorado, where he worked, which "would have shown that Albert could not have robbed this Kansas bank (or the Bank of Colorado in Grand Junction for that matter)";[122] 2) the testimony of various homeowners and business owners for whom he worked, who "could have attested to his presence in Colorado on the days in question";[123] and 3) the testimony of "other employees of the landscaping business," who could have also testified to his

---

[119]407 U.S. 514 (1972).

[120]Doc. 218 at 13.

[121]*Id.*

[122]*Id.*

[123]*Id.*

presence in Colorado."[124]

"When . . . the basis for the ineffective assistance claim is the failure to raise an issue, we must look to the merits of the omitted issue.  If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance."[125]  Thus, Petitioner has the burden in this § 2255 action to show that his counsel had a colorable basis to file such a motion and that this Court probably would have granted it.[126]

"In determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, a court must balance four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) any prejudice to the defendant."[127]  "No one of the factors is necessary or sufficient to conclude a violation has occurred."[128]  "Instead, the factors are related and must be considered together along with other relevant circumstances."[129]  "'The first factor, length of delay, functions as a triggering mechanism' and 'the remaining factors are examined only if the delay is long enough to be presumptively prejudicial.'"[130]

---

[124]*Id.*

[125]*United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006)

[126]*Id.*; *Sperry v. McKune*, 445 F.3d 1268 (10th Cir. 2006) (explaining that trial counsel's failure to raise a meritless issue is not ineffective assistance).

[127]*United States v. Toombs*, 574 F.3d 1262, 1274 (10th Cir. 2009) (citing *Barker*, 407 U.S. at 530); *see also United States v. Seltzer*, 595 F.3d 1170, 1176 (10th Cir. 2010).

[128]*Toombs*, 574 F.3d at 1274 (citing *Barker*, 407 U.S. at 530).

[129]*Id.* (citing *United States v. Gomez*, 67 F.3d 1515, 1521 (10th Cir. 1995)).

[130]*Id.* (quoting *United States v. Yehling*, 456 F.3d 1236, 1243 (10th Cir. 2006)).

1.      **Length of Delay**

The Government concedes that the two and one-half year delay about which Petitioner complains is presumptively prejudicial.[131]   This factor weighs against the Government.

2.      **Reason for Delay**

The second factor is "the reasons offered by the government for not bringing a timely suit."[132]  "This factor is especially important: 'the flag all litigants seek to capture is the second factor, the reason for delay.'"[133]  "The burden belongs to the government to provide an acceptable rationale for the delay."[134]  The court should consider whether the delay was a "deliberate attempt to delay the trial . . . [or] a more neutral reason such as negligence."[135]

Petitioner cites *United States v. Seltzer*[136] in support of his argument that the Government's reason for delay in his case was not justified.  In *Seltzer*, the government asserted that the reason for "the delay was the desire to complete the state proceedings on unrelated drug charges before continuing with the federal charges."[137]  The Tenth Circuit, citing the Fourth and Sixth Circuits, found that "awaiting the completion of another sovereign's prosecution may be a plausible reason for delay in some circumstances, but it does not necessarily mean that it is a

---

[131]*United States v. Batie*, 433 F.3d 1287, 1290 (10th Cir. 2006) ("Delays approaching one year generally satisfy the requirements of presumptive prejudice.").

[132]*Seltzer*, 595 F.3d at 1177.

[133]*Id.* (citing *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)).

[134]*Id.* (citing *Jackson v. Ray*, 390 F.3d 1254, 1261 (10th Cir. 2004)).

[135]*Id.* (internal quotation marks omitted).

[136]*Id.* at 1170.

[137]*Id.*

justifiable excuse in every case."[138]  The court further explained that "the government must make a particularized showing of why the circumstances require the conclusion of the state proceedings before the federal proceedings can continue.  The mere fact that the defendant was incarcerated on a previous charge for a portion of the delay does not by itself excuse the delay."[139]  "Thus, the government needs to show that it has sufficient justification for waiting for the state proceedings in this particular case."[140]  In *Seltzer*, the Tenth Circuit found that this factor weighed against the government, citing no overlap in the charges or proceedings; concurrent proceedings would not be logistically cumbersome; and the simplicity of the charges.[141]

This case can be distinguished from *Seltzer*, however, as the Government was not waiting for the completion of state court proceedings before filing charges in this case.  Instead, the delay in this case was due to the fact that Petitioner was being prosecuted on federal bank robbery charges in the District of Nevada, and was in their custody from at least July 13, 2005 to October 10, 2007.[142]  Moreover, Seltzer's state charges were pending in Colorado state court, and the unrelated federal charges against him were also the result of conduct that occurred in Colorado, and were ultimately brought to the federal district court seated in Colorado.[143]  Thus, the *Seltzer*

---

[138]*Id*. at 1177–78; *see United States v. Schreane*, 331 F.3d 548, 554 (6th Cir. 2003); *United States v. Thomas*, 55 F.3d 144, 151 (4th Cir. 1995).

[139]*Seltzer*, 595 F.3d at 1178 (citing *Jackson*, 390 F.3d 1262) (remaining citations omitted).

[140]*Id*.

[141]*Id*.

[142]*See* Doc. 219, Ex. A.

[143]*Seltzer*, 595 F.3d at 1178.

court found there were not any logistical justifications for delaying the federal charges, since both the state and federal charges were pending in the same state.[144]  In Petitioner's case, however, there was a pending federal case for bank robbery in Nevada, which delayed the federal bank robbery charge here in Kansas, where a separate robbery occurred.  And, the Petitioner's prosecution on the federal Nevada charges fully accounted for the delay and justified putting his Kansas case on hold until that prosecution was completed.  Moreover, there is no evidence of the Government dragging its feet in this case, as six days after the district court in Nevada docketed its Judgment on October 10, 2007, Petitioner was arrested in this case and brought to Kansas for his arraignment on October 18, 2007.  This factor weighs in favor of the Government.

### 3.      Assertion of Right

The third factor is "whether the defendant asserted his right to a speedy trial."[145]  If the defendant has asserted his right, that "is given strong weight in deciding whether there has been a speedy trial violation."[146]  Where a defendant, "even without the benefits of counsel, twice asserted his speedy trial rights," the Tenth Circuit found this factor weighed "strongly in favor of" defendant.[147]  In this case, however, Petitioner is raising his speedy trial rights for the first time in his § 2255 motion.  Petitioner asserts that he did not raise the issue before his arrest in this case because he did not have knowledge of the charges against him in Kansas while he was

---

[144]*Id.*

[145]*Id.*

[146]*Id.*

[147]*Id.*

being prosecuted in Nevada.  He also asserts that after he was arrested, he indicated to counsel

that he wanted to go to trial "and get this over with," thus indicating his desire to assert his right

to a speedy trial.  While Petitioner's argument is tenuous, because the burden of protecting one's

right to a speedy trial is not placed upon a defendant, this factor neither weighs for or against a

finding of a violation of Petitioner's right to a speedy trial.[148]

### 4.  Prejudice

The final factor is prejudice, and "'[t]he individual claiming the Sixth Amendment

violation has the burden of showing prejudice.'"[149]  The court "assess[es] prejudice in light of the

interests that the speedy trial right was designed to protect."[150]  The Supreme Court has identified

three main interests: (1) the prevention of oppressive pretrial incarceration; (2) the minimization

of anxiety and concern of the accused; and (3) the minimization of the possibility that the

accused's defense will be impaired.[151]  Of these interests, the most serious is the "hindrance of

the defense" because the inability of a defendant to adequately prepare his case "skews the

fairness of the entire system."[152]  "Because the seriousness of a post-accusation delay worsens

when the wait is accompanied by pretrial incarceration, oppressive pretrial incarceration is the

second most important factor."[153]

---

[148]*Barker v. Wingo*, 407 U.S. 514, 527 (1972) ("A defendant has no duty to bring himself to trial").

[149]*Seltzer*, 595 F.3d at 1179 (quoting *Toombs*, 574 F.3d at 1275).

[150]*Id.*

[151]*Id.* (citing *Barker*, 407 U.S. at 532).

[152]*Id.* at 1179–80 n.3 (explaining that in some cases of extreme delay of at least six years, the defendant need not show specific evidence of prejudice) (citing *Doggett v. United States*, 505 U.S. 647, 655 (1992)).

[153]*Id.* (quoting *Jackson*, 390 F.3d at 1264).

Petitioner claims that the delay resulted in business records, specifically those at his brother's landscaping business, and "multiple witnesses" being lost, all of which would have proven his innocence of both the Kansas and the Colorado bank robberies.  These allegations are too vague and conclusory for this Court to give much weight.  Petitioner does not provide this Court with any evidentiary basis to find that his brother Robert's landscape business ever possessed records that could show that he worked on the dates and at the times of the Kansas and Colorado robberies.  And although he represents that by October 2007, the records "were gone," he does not provide any factual support for this claim beyond asserting that his brother had a "vibrant business" at which Petitioner worked, and that the firm dissolved after his arrests.  Nor does he identify by name any witness with whom he worked or did work for who could have offered testimony, or what their testimony would have been, including that of Robert.  Even without any "records," surely these "multiple witnesses" could have corroborated any potential alibi.  These conclusory claims of prejudice are simply too thin, and without a further showing, it is impossible for this Court to discern prejudice from Petitioner's vague and unsupported allegations.

Accordingly, Petitioner's counsel did not ineffectively fail to file a motion to dismiss the Indictment on speedy trial violation grounds because any such motion would have been meritless.  Petitioner's claim fails under both *Strickland* prongs, and is denied.

**B.** **The Apology Letter, FBI Special Agent Abbott's Testimony, and "Fraud on the Court"**

Under Ground Two, Petitioner makes a two-pronged claim.  First, he asserts that the prosecutor in this case solicited perjured testimony from FBI Agent Abbott at trial where, he

alleges, Agent Abbott falsely testified that Petitioner "confessed to robbing a bank in Grand Junction on October 2, 2004, and that Petitioner's "letter to Ms. Higdon was written as a general apology to all of the tellers at the various banks that Albert robbed, including the bank in Grand Junction." Second, Petitioner argues that the prosecutor committed fraud on this Court at the motions hearing on October 14, 2009, by representing that a teller at the Grand Junction robbery specifically identified Petitioner from a photograph as the person who committed that robbery. The Court addresses each claim in turn.

### 1.    Agent Abbott

The Court rejects Petitioner's claim that Agent Abbott falsely testified that Petitioner confessed to him that he committed the Grand Junction robbery. Petitioner claims that Agent Abbott, while under oath at a motions hearing on October 14, 2009, "swore that there was no mention of an increased penalty for the use of a firearm during the Kansas robbery." Then, later at trial, Abbott testified that he had "made a mistake" and had told Petitioner that "some robberies were more serious than others" including those involving guns. Construing Petitioner's claims under the more relaxed standards used with a *pro se* party, he contends that this mistake renders Abbott's credibility questionable, that the jury should have been made aware of this, and that Abbott's testimony regarding Petitioner's confession is also false. This argument is without merit.

First, Petitioner offers no proof of the falsity of Agent Abbott's testimony. Instead, he merely offers the Court his own speculations about Agent Abbott's motives for offering the testimony. Second, Petitioner cannot maintain that counsel performed deficiently when the Government offered this testimony at trial. In fact, counsel challenged the accuracy and

24

credibility of Petitioner's confession during his vigorous cross-examination of Agent Abbott, going so far as to suggest that Petitioner falsely confessed to the robbery for some sentencing benefit.[154]  Counsel further challenged the confession on various grounds, including that there was no recording of the interview where the confession occurred, that Petitioner did not sign any photo acknowledging he committed the robbery, that Petitioner was never convicted of the Grand Junction robbery, and that statements given by Petitioner about the robbery did not match how the tellers described the robbery.[155]  The Court agrees with the Government that by any standard, this was not deficient performance and was certainly not "outside the wide range of professionally competent assistance."[156]

The Court also rejects Petitioner's claim that Agent Abbot perjured himself again when he testified about the letter to the tellers.  Petitioner's characterization of Agent Abbott's testimony is incorrect—he testified only that the letter was an apology to "the tellers," but he did not offer any detail regarding "all of the tellers at various banks," after the Court ruled on counsel's objection to admission of the letter.  To the extent Petitioner claims counsel was ineffective in his objection to admission of the letter, the Tenth Circuit ruled on the admissibility of the letter in question on direct appeal, and concluded that it was error to admit the letter, but that ultimately the admission was harmless given the "overwhelming evidence" at trial.[157]  Likewise, even if Petitioner's counsel's concessions about the letter can be considered

---

[154]Doc. 206 at 624–38.

[155]*Id.*

[156]*Strickland v. Washington*,  466 U.S. 668, 690 (1984).

[157]*United States v. Vaughan*, 450 F. App'x 757, 762 (10th Cir. 2011).

amounting to ineffective counsel, because the inclusion of the letter was harmless error, the alleged ineffective counsel did not cause prejudice because it did not affect the outcome of the trial.

### 2.       Fraud on the Court

The Court also rejects Petitioner's claim that the Government, through Assistant United States Attorney Hough, committed "fraud on the court" at the suppression hearing by stating that a bank teller identified Petitioner as the perpetrator of the bank robbery of the Grand Junction bank, and that counsel's failure to bring this to the attention of the court was ineffective counsel. At that hearing, AUSA Hough represented, "Now Judge, the Grand Junction robbery the teller identified specifically a photograph of this defendant as the person who perpetrated that crime."[158]  At trial, three employees at the Bank of Colorado testified as to what occurred when a lone gunman robbed their bank in Grand Junction.  While none of the women were able to identify Petitioner from a photo line-up, all three were shown photographs of the Salina, Kansas robbery and testified that the photos were similar or identical to the individual who robbed their bank.  While AUSA Hough's statement at the suppression hearing is not wholly consistent with the tellers' testimony at trial, as asserted by the Government, it does not rise to the level of fraud on the court.

Fraud on the court is an extremely serious charge, and is a high standard to meet.[159]  It cannot be fraud on the court when there is simply a false statement or perjury committed in court; the act must be such that "the impartial functions of the court have been directly

---

[158]Doc. 174 at 63.

[159]*U.S. v. Buck*, 281 F.3d 1336, 1342 (10th Cir.  2002).

corrupted."[160]  In AUSA Hough's case, even assuming *arguendo* that his statements to the court during a pretrial hearing were false, there is nothing to show that the statements resulted in such a miscarriage of justice that the very impartiality of court functioning was affected.  In fact, at trial the bank tellers did testify as to whether or not they could identify Petitioner based on a photo lineup, and there is nothing to suggest, nor does Petitioner allege, that their testimony was false.  The Court and the jury did then have the opportunity to hear and consider this testimony, and AUSA Hough's prior statements had no effect on this testimony.  Likewise, because AUSA Hough's comments occurred during the suppression hearing, the jury did not hear, and in turn, the comments had no bearing on the outcome of the trial.  Thus, counsel's failure to raise concerns about AUSA Hough's comments was not indicative of ineffective counsel because there was no prejudice to Petitioner.  This claim is also denied.

### C.      Failure to Investigate and Produce Evidence Favoring Defendant

Finally, Petitioner claims that his counsel ineffectively failed to produce records and witnesses that could have exonerated him.  He maintains that his counsel ineffectively: (1) failed to produce his cell phone records for October 2004, which "would have show that Albert was in Colorado the entire month" and "absolved Albert of both the Grand Junction and the Salina robberies"; (2) failed to tell this Court that "Albert did not admit to robbing the Bank of Colorado in Grand Junction" and that his confession was fabricated by Agent Abbott; (3) failed to subpoena the tellers from the Bank of Colorado in Grand Junction, whose testimony would have proven that his confession to that robbery was false; (4) failed to subpoena Leea

---

[160]*Id.*

27

Greenville's school records, which would show that she mistakenly identified that she was off from school in October 2004; (5) failed to subpoena Leea Greenville's internet service records to show that she did no MAPQUEST search for directions from Colorado to Kansas City in October 2004; and (6) failed to introduce evidence about the *Ross Williams* case that occurred in Coffeyville, Kansas, where the defendant in that case allegedly used a bicycle in a bank robbery. All of these claims fail under both *Strickland* prongs.

First, Petitioner does not proffer any evidence with respect to his claim that counsel did not subpoena or produce certain record evidence that would have helped his case. He does not aver that he told former counsel about the cell phone and school records that he claims would have exonerated him, nor does he demonstrate that such records would have definitively shown that his cell phone was not in Kansas on the date of the robbery or that Greenville was not on break from school in October 2004. In order to merit an evidentiary hearing to determine whether counsel knew about or failed to obtain this allegedly exculpatory evidence, a § 2255 motion must present more than mere unsupported allegations. In this case, however, Petitioner's factual allegations are conclusions rather than statements of fact, and do not support his claim that counsel performed deficiently or that his case was prejudiced.[161]

Second, Petitioner's counsel did challenge his confession to the Grand Junction robbery, both in a motion to suppress and during his cross-examination of Agent Abbott. This Court denied Petitioner's motion to suppress his statements to Agent Abbott, after determining that his

_____

[161]*See United States v. Caraway*, No. 06-40138-RDR, 2010 WL 3721689, at *2 (D. Kan. Sept. 15, 2010) (citing *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)); *see also United States v. Harrison*, 375 F. App'x 830, 833 (10th Cir. 2010) (explaining without "detailed and specific facts to back up his allegation . . . [petitioner's] claims are vague, conclusory, and palpably incredible and he cannot make a substantial showing of the denial of a constitutional right"); *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (rejecting ineffective assistance claims which are merely conclusory in nature and without factual avermants).

confession was neither coerced nor involuntary.[162]  Nor was counsel deficient for failing to subpoena the Bank of Colorado tellers.  The Government called these witnesses to testify and counsel cross-examined them at trial.  Moreover, during his cross-examination of these witnesses, counsel pointed out that the tellers could not identify Petitioner in photo line-ups and that their version of events were sometimes inconsistent with Petitioner's version of events that he gave to Agent Abbott as part of his confession.[163]

Finally, Petitioner's counsel did not ineffectively fail to present evidence about the *Ross Williams* case to the jury.  It appears that Petitioner is referring to *United States v. Ross Alan Williams*, filed in the United States District Court for the District of Kansas, Case No. 09-10013-01-JTM.  In that case, the defendant pleaded guilty to robbing the Bank of America in Coffeyville, Kansas, on February 17, 2009.[164]  In fleeing from the scene of that robbery, the defendant traveled from the bank on a bicycle to a vehicle in a nearby parking lot, where he placed the vehicle.[165]  But as the Government points out, evidence of events in that case would have been irrelevant to the instant case, even for purposes of undermining the Government's *modus operandi* theory, because that robbery occurred more than four and one-half years after the instant robbery, and any inference that Ross Williams committed the Salina robbery before he committed the Coffeyville robbery is too tenuous and speculative to be relevant.  Indeed, this Court granted Petitioner's Motion *in Limine* to exclude evidence of other bank robberies as

---

[162]Doc. 136 at 16–22.

[163]Doc. 206 at 509–10 (Salazar), 527–29 (Reeves), 547–49 (Kimble).

[164]No. 09-10013, Doc. 70, Plea Agrm't.

[165]*Id.*

insufficiently unique for the purposes of establishing whether Petitioner had a "signature" bank robbery, including robberies where the individual used a bicycle as a getaway vehicle.[166] Accordingly, Petitioner's counsel did not ineffectively fail to present this irrelevant and inconsequential evidence to the jury.

Nor does Petitioner sustain his burden to show that counsel's failure to present this evidence to the jury caused him prejudice under *Strickland*. As noted, Petitioner merely speculates as to what is in the cell phone and school records. Counsel challenged his confession to the Grand Junction bank robbery both pretrial and during cross-examination. The *Ross Williams* case is irrelevant to his own case and had no evidentiary value to his defense. Accordingly, Petitioner cannot demonstrate prejudice because he does not demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[167]

Moreover, as noted by the Tenth Circuit, the evidence presented against Petitioner at trial was "overwhelming," and included four eyewitnesses who gave consistent descriptions of the Salina robber, one of whom identified Petitioner out of a photo line-up and at trial.[168] The court also noted the admissible *modus operandi* evidence was highly persuasive as to the identity of the Salina robber.[169] The similarities between the Grand Junction and Salina robberies were sufficient to constitute a signature quality, and thus bolstered the tellers' testimony. Petitioner's

---

[166]Doc. 136 at 29–34.

[167]*Strickland*, 466 U.S. at 694.

[168]*United States v. Vaughan*, 450 F. App'x 757, 763 (10th Cir. 2011).

[169]*Id.*

girlfriend testified that he was in Kansas during October 2004, and recognized him from the photos of the Salina robbery.  Given the overwhelming evidence, it is highly unlikely that the result of trial would have been different had his counsel introduced the evidence Petitioner now claims would have exonerated him or aided in his case.  Thus, Petitioner fails to show the requisite prejudice under *Strickland*, and this claim is also denied.

## V.    Certificate of Appealability

Effective December 1, 2009, Rule 11 of the Rules Governing Section 2255 Proceedings requires the Court to grant or deny a certificate of appealability ("COA") when making a ruling adverse to the petitioner.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[170]  A petitioner may satisfy his burden only if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[171]  A petitioner is not required to demonstrate that his appeal will succeed to be entitled to a COA.  He must, however, "prove something more than the absence of frivolity or the existence of mere good faith."[172]  "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims.  In fact, the statute forbids it."[173]  For the reasons detailed in this Memorandum and Order, Petitioner has not made a substantial showing of the denial of a constitutional right, and the Court denies a

---

[170]28 U.S.C. § 2253(c)(2).  The denial of a § 2255 motion is not appealable unless a circuit justice or a circuit or district judge issues a certificate of appealability.  *See* Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

[171]*Said v. Ortiz*, 393 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Lennard v. Dretke*, 524 U.S. 274, 282 (2004)).

[172]*Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

[173]*Id.* at 336; *see also United States v. Silva*, 430 F.3d 1096, 1100 (10th Cir. 2005).

COA as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Albert Lawrence

Vaughan's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc.

216) is DENIED; Petitioner is also denied a COA.

**IT IS SO ORDERED.**

Dated: October 10, 2014

 S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE